**RECORD NO. 17-1374**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

**KENNETH L. HUNTER; RICK A. DONATHAN; and JERRY D. MEDLIN,**

*Plaintiffs-Appellants,*

v.

**TOWN OF MOCKSVILLE, NORTH CAROLINA; ROBERT W. COOK, in his official capacity as Administrative Chief of Police of the Mocksville Police Department and in his individual capacity; and CHRISTINE W. BRALLEY, in her official capacity as Town Manager of the Town of Mocksville and in her individual capacity,**

*Defendants-Appellees.*

**INTERLOCAL RISK FINANCING
FUND OF NORTH CAROLINA**

*Intervenor-Appellee*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO**

### OPENING BRIEF OF PLAINTIFFS-APPELLANTS

Reynolds Michael Elliot
**ELLIOT MORGAN PARSONAGE**
**Suite 200**
**300 East Kingston Avenue**
**Charlotte, NC 28203**
**(704) 707-3705 (Telephone)**
michaelelliot@emplawfirm.com

Robert Mauldin Elliot
**ELLIOT MORGAN PARSONAGE**
**Brickenstein-Leinbach House**
**426 Old Salem Road**
**Winston-Salem, NC 27101**
**(336) 724-2828 (Telephone)**
rmelliot@emplawfirm.com

**Counsel for Plaintiffs-Appellants-
Hunter, Donathan, and Medlin**

**Counsel for Plaintiffs-Appellants-
Hunter, Donathan, and Medlin**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 17-1374      Caption: HUNTER, et al. v. TOWN OF MOCKSVILLE, NC, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kenneth L. Hunter; Rick A. Donathan; Jerry D. Medlin
(name of party/amicus)


who is _____ Plaintiffs-Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                        ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                           ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES  ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES  ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐ YES  ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/Robert M. Elliot _____     Date: ___April 7, 2017___

Counsel for: Plaintiffs-Appellant _____

## CERTIFICATE OF SERVICE
**************************

I certify that on ___April 7, 2017___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

SEE ATTACHED CERTIFICATE OF SERVICE

/s/Robert M. Elliot _____                 ___April 7, 2017___
        (signature)                                             (date)

# <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE

TABLE OF CONTENTS…………………………………………………………….. i

TABLE OF AUTHORITIES…………………………………………………….. iii

JURISDICTIONAL STATEMENT………………………………………… 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW……………… 1

STATEMENT OF THE CASE……………………………………………… 2

SUMMARY OF THE ARGUMENT……………………………………... 9

ARGUMENT

I.  WHEN AN INSURANCE POLICY EXPLICITLY LIMITS COVERAGE FOR
    DAMAGES OF MULTIPLE PERSONS BY A $3 MILLION AGGREGATE,
    THE DISTRICT COURT ERRED BY USING THE CLAUSE ON THE "EACH
    CLAIM LIMIT," WHICH APPLIES TO A SINGLE CLAIMANT AND HIS
    LOSS, TO CREATE A $1 MILLION LIMIT FOR THE DAMAGES OF
    MULTIPLE PERSONS; THE DEFENDANT TOWN HAS WAIVED ITS
    IMMUNITY TO THE EXTENT OF ITS "ANNUAL AGGREGATE LIMIT"
    OF $3 MILLION TO BE APPLIED TO THE JUDGMENTS IN THIS ACTION……........ 11

    A.  The Policy:  The Declaration and Limits of Insurance…………….. 12

    B.  Plain Language Application to the Facts…………………….... 14

    C.  Traditional Rules of Interpretation of Insurance Contracts
        applied to the Plain Intent in the Structure and Language of
        the Policy……………………………………………………… 18

        1.  The Law of Interpretation of Insurance Policies……………. 18

        2.  The Common Sense Interpretation of Section III…………… 20

i

a.    The structure of the Declarations and Section III distinguishes between the "damages" of multiple persons in ¶2 and the claims of a single claimant and his loss in ¶3…………………………………... 21

b.    The wording of ¶3, using the singular "each" and the singular "loss" in the first sentence, especially in conjunction with the plural "act(s)," "claims," and "insureds" of the second sentence, make clear that ¶3 refers to a single claimant…………………….. 22

c.    The insurance company used the word "interrelated" to allow, under limited circumstances, the combining of multiple claims of a single claimant………………. 26

d.    The rule of *in pari materia* requires the provision on the Deductible and Section III to be consistent with each other……………………………………………... 32

II.    WHEN THE EVIDENCE ESTABLISHED THAT PLAINTIFFS' CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE INDIVIDUAL DEFENDANTS, WHO WERE THE FINAL POLICYMAKERS FOR THE TOWN, AND TO WHOM THE TOWN HAD DELEGATED ALL POWER AND AUTHORITY TO DETERMINE PERSONNEL AND POLICE POLICIES, THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT TOWN OF MOCKSVILLE AS TO PLAINTIFFS' 42 U.S.C. § 1983 CLAIMS…………………………………………………... 34

III.    THE DECISIONS IN *CORUM* AND *CRAIG* DICTATE THAT TO THE EXTENT IMMUNITY APPLIES TO BAR ADEQUATE RELIEF ON PLAINTIFFS' WRONGFUL DISCHARGE CLAIM, THEY MUST RECOVER ON THEIR STATE CONSTITUTIONAL CLAIMS……………………………………………….. 40

IV.    THE DISTRICT COURT ERRED IN DENYING TO OFFICER MEDLIN THE PREFERRED REMEDY OF REINSTATEMENT OR ALTERNATIVELY, ADEQUATE FRONT PAY FOR THE BLATANT VIOLATION OF HIS CONSTITUTIONAL RIGHTS……………………………………………….. 46

CONCLUSION…………………………………………………………….. 52

REQUEST FOR ORAL ARGUMENT………………………………….. 52

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)(i)……………... 54

CERTIFICATE OF SERVICE………………………………………………... 55

## TABLE OF AUTHORITIES

Federal Cases

*Avery v. County of Burke*,
    660 F.2d 111 (4th Cir. 1981)……………………………………….... 35

*Bates v. Board of Education,*
    2000 US Dist. LEXIS 4873 (D. Del. 2000)……………………………… 51

*Baynard v. Malone*,
    268 F.3d 228 (4th Cir. 2001)…………………………………………… 35

*Dotson v. Pfizer,*
    558 F.3d 284 (4th Cir. 2009)…………………………………………… 46

*Duke v. Uniroyal, Inc.*,
    928 F.2d 1413 (4th Cir. 1991)………………………………………... 47

*Edwards v. City of Goldsboro*,
    178 F.3d 231 (4th Cir. 1999)…………………………………… 35, 39, 41

*Flanagan v. Munger*,
    890 F.2d 1557 (10th Cir. 1989)………………………………………… 38

*Garraghty v. Jordan*,
    830 F.2d 1295 (4th Cir. 1987)………………………………… 34, 41

*Garza v. Brownsville Independent School Dist.,*
    700 F.2d 253 (5th Cir. 1983)………………………………….. 47, 48

*Gros v. The City of Grand Prairie, Texas,*
    181 F.3d 613 (5th Cir. 1999)…………………………………………… 40

*Hunter v. Town of Mocksville*,
    789 F.3d 389 (4th Cir. 2015)…………………………………………... 2

*Koyen v. Consolidated Edison Co.,*
    560 F.Supp. 1161 (S.D.N.Y. 1983)…………………………………….. 47

*Ogden v. Wax Works, Inc.,*
    29 F. Supp. 2d 1003 (N.D. Iowa 1998)…………………………………… 50

*McInnis v. Fairfield Cmtys., Inc.,*
    458 F.3d 1129 (10th Cir. 2006)…………………………………………… 52

*Monell v. New York City Dept. of Soc. Servs.,*
    436 U.S. 658 (1978)……………………………………………………… 35

*Morden v. XL Specialty Ins.Co.,*
    2016 U.S. Dist. LEXIS 46201 (D. Utah 2016)…………………………… 23

*Oklahoma City v. Tuttle,*
    471 U.S. 808 (1985)……………………………………………………… 35

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986)……………………………………………………… 35

*Purdy v. Town of Greenburgh,*
    178 F. Supp. 2d 439 (S.D.N.Y. 2002)…………………………………… 40

*Randle v. City of Aurora,*
    69 F.3d 441 (10th Cir. 1995)………………………………………….. 34, 39

*Rhyne v. Henderson County,*
    973 F.2d 386 (5th Cir. 1992)…………………………………………… 35

*Shaw v. Stroud,*
    13 F.3d 791 (4th Cir. 1994)…………………………………………… 36

*Sigma Financial Corp. v. American Intern. Specialty Lines Ins. Co.,*
    200 F.Supp. 2d 697 (E.D. Mich. 2001)………………………………… 30

*Spell v. McDaniel,*
    824 F.2d 1380 (4th Cir. 1987)………………………………………….. 35

*Squires v. Bonser,*
    54 F.3d 168 (3d Cir. 1995)……………………………………………... 47

*Starrett v. Wadley*,
    876 F.2d 808 (10th Cir. 1989)…………………………………….. 38

*Valentino v. Vill. of S. Chi. Heights*,
    575 F.3d 664 (7th Cir. 2009)………………………………………... 34, 40

*Weeks v. City of Plano*,
    1989 US Dist. LEXIS 2353 (N.D. Ill. 1989)……………………… 40

<u>State Cases</u>
*Barnett v. Karpinos,*
    119 N.C. App. 719, 460 S.E.2d 208 (1995)……………………… 39

*Barr v. Colorado Ins. Guar. Ass'n*,
    920 P.2d 102 (1995)……………………………………………… 24

*Beaufort County Sch. Dist. v. United Nat'l In. Co.*,
    392 S.C. 506, 709 S.E.2d 85 (2011)…………………………... 23, 28, 29, 30

*Blakeley v. Town of Taylortown*,
    233 N.C. App. 441 (2014)………………………………………… 47

*City of Greenville v. Hayward*,
    130 N.C. App. 271, 275 502 S.E.2d 430 (1998)………………….. 19

*Combs v. Town of Belhaven*,
    106 N.C. App. 71, 415 S.E.2d 91 (1992)………………………… 12

*Corum v. University of North Carolina*,
    330 N.C. 761 (1992)……………………………………………... 41, 47

*Craig v. New Hanover County Bd. Of Educ.*,
    363 N.C. 334 (2008)……………………………………………… 43

*Dawes v. Nash County*,
    357 N.C. 442, 584 S.E.2d 760 (2003)…………………………… 33

*Debaun v. Kuszaj*,
    228 N.C. App. 567 (2013)……………………………………………… 45

*Durham City Bd. of Educ. v. National Union Fire Ins. Co.*,
    109 N.C. App. 160, 426 S.E.2d 451 (1993)………………………... 19, 25

*Glenn-Robinson v. Acker*,
    140 N.C. App. 606 (2000)……………………………………………… 45

*Fulford v. Jenkins*,
    195 N.C. App. 402, 672 S.E.2d 759 (2009)………………………..... 19

*Harleysville Mut. Ins. Company v. Buzz Off Insect Shield L.L.C.*,
    364 N.C. 1, 692 S.E.2d 605 (2010)………………………………….. 19

*Hawkins v. State*,
    117 N.C. App. 615 (1995)……………………………………………… 45

*Lexington Ins. Co. v. Lexington Healthcare Group, Inc.*,
    311 Conn. 29, 84 A.3d 1167 (2014)…………………………………… 23

*Maddox v. Colonial Life & Acc. Ins. Co.*,
    303 N.C. App. 650, 280 S.E.2d 908 (1981)………………………... 20, 33

*Patterson v. City of Gastonia*,
    220 N.C. App. 233 (2012)……………………………………………… 45

*Quinn v. State Farm Mut. Auto. Ins. Co.*,
    238 S.C. 301, 120 S.E.2d 15 (1961)…………………………………… 28

*Sale v. State Highway & Public Works Com.*
    242 N.C. 612 (1955)…………………………………………………… 42

*Swain v. Efland*,
    145 N.C. App. 383 (2001)……………………………………………… 45

*Tyler v. Nationwide Mut. Ins. Co.*,
    101 N.C. App. 713, 401 S.E.2d 80 (1991)………………………….... 25

*Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.,*
   276 N.C. 348, 172 S.E.2d 518 (1970)…………………………… 12, 26

*Washington Hsg. Auth. v. North Carolina Hsg. Auth.. Risk Retention Pool,*
   130 N.C. App. 279, 502 S.E.2d 626 (1998)……………………………… 20

<u>Statutes, Rules, Code and Other Authorities</u>
United States Code chapter 28 §1291…………………………………………... 1

United States Code chapter 28 §1331…………………………………………... 1

United States Code chapter 28 §1367…………………………………………... 1

United States Code chapter 42 §1983…………………………………… *passim*

North Carolina General Statute § 160A-164………………………………….. 37

North Carolina General Statute §160A-485…………………………………... 12

Town of Mocksville Code, § 2-4.1 (2003)…………………………………….. 36

Mocksville Police Department Code, Policy 346……………………………... 38

Mocksville Police Department Code, Policy 348……………………………... 37

Mocksville Police Department Code, Policy 347……………………………... 37

Merriam-Webster, definition of "adequate"…………………………………... 42

## STATEMENT OF JURISDICTION

The jurisdiction of the district court as to plaintiffs' 42 U.S.C. § 1983 claims was based on 28 U.S.C. § 1331, and 42 U.S.C. §§ 1983 and 1988. The jurisdiction of the district court as to plaintiffs' wrongful discharge and North Carolina state constitutional claims was based on the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

On April 23, 2017, plaintiffs filed their Notice of Appeal of the district court's grant of summary judgment to the defendant Town of Mocksville as to plaintiffs' § 1983 claims,[1] and its Judgment of March 3, 2017, and orders concerning all issues brought forward.  JA 2857.

The jurisdiction of this Court with respect to all issues raised below is based on 28 U.S.C. § 1291, since the Judgment of the district court is a final order deciding all claims as to all parties.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The error in granting summary judgment in this case is founded on the following issues:

1.     When an insurance policy explicitly limits coverage for damages of

---

[1] Plaintiffs initially appealed the court's grant of summary judgment to the defendant Town as to plaintiffs' § 1983 claims on February 10, 2014, as a cross-appeal to defendants' appeal of the district court's denial of qualified immunity. JA 1145.  This Court determined in its earlier decision that since there had been no "final decision," the issue was not reviewable at that time.  *Hunter v. Town of Mocksville*, 789 F.3d 389, 402 (4th Cir. 2015), *cert. denied* 136 S. Ct. 897 (2016).

1

multiple persons by a $3 Million aggregate, did the district court err by using the clause on the "Each Claim Limit," which applies to a single claimant and his loss, to create a $1 Million limit for the damages of multiple persons?

2.    When the evidence established that plaintiffs' constitutional rights were violated by the individual defendants, who were the final policymakers for the Town, to whom the Town had delegated all power and authority to determine personnel and police policies, did the district court err in granting summary judgment to defendant Town of Mocksville as to plaintiffs' 42 U.S.C. § 1983 claims?

3.    Did the district court err in dismissing plaintiffs' North Carolina state constitutional claims when plaintiffs demonstrated that they could not obtain adequate relief under their wrongful discharge claims due to the Town's defense of sovereign immunity?

4.    Did the district court err in denying the preferred remedy of reinstatement to Officer Medlin, and was the substantial reduction of the front pay awarded by the jury in error?

## STATEMENT OF THE CASE

### Opening Statement

Our courts in general, and this Court in particular, have lauded the role of those willing to stand up and report corruption in the public interest.  Indeed, "'speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment,'" and the importance of such speech is "'especially evident in the context of… a public corruption scandal.'" *Hunter v. Town of Mocksville*, 789 F.3d 389, 396, *quoting from, Lane v. Franks*, 134 S. Ct. 2369, 2379-80 (2014).

2

This Court, the district court, and ultimately, the jury, have upheld the actions of the plaintiffs in standing up against their chief and town manager, and exposing departmental corruption in the interest of the public. However, the support of the plaintiffs in their actions and the recognition of their sacrifice is not enough. In short, no whistleblower would choose to endure the destruction to his career and upheaval to his life which each plaintiff has suffered through the loss of his long-term employment as a police officer, the general blacklisting which each has faced in the law enforcement community, the suffering of not only himself but his family members, and 5 ½ years of costly litigation which continues.

If the law is to support whistleblowers, there must be remedies which can adequately compensate them for their sacrifices. Such remedies have been substantially denied to these plaintiffs. While the jury wasted little time in entering its verdict, finding unconstitutional the town officials' actions in terminating plaintiffs' employment, and awarding substantial damages, that verdict now seems all but forgotten in view of the district court's post-trial decisions, which have time and again reduced or eliminated their compensation and withheld remedies at the court's disposal. Specifically, the court substantially reduced the jury's front pay award, confidently predicting that "any cloud over [their] reputation[s] as a result of … termination and this litigation should be lifted by the jury's finding that [they were] wrongfully discharged," (JA 2665), and the plaintiffs would be able to

continue in their profession. For two of the plaintiffs, that has not happened since the court denied reinstatement; one (Officer Hunter) because he was approaching retirement age, and the other (Officer Medlin) apparently because he had vented his frustration at a very difficult time. The court interpreted the Town of Mocksville's (Town) insurance policy in favor of the intervenor insurance company, limiting the Town's liability to less than one-fourth of the jury verdict, and less than one-half of the court's reduced award. Finally, by dismissing plaintiffs' state constitutional claims, the court found the minimum coverage of the insurance "adequate relief," thereby totally and finally eliminating any accountability or responsibility of the Town and its officials for the substantial damages they have caused to these plaintiffs' lives. Consequently, plaintiffs have been left with a pittance of the compensation they deserve, and the realization that the price of their stand against corruption was too much to bear.

Plaintiffs are requesting that this Court uphold these plaintiffs' constitutional rights by ensuring that available remedies under the law will be provided to make them whole.

### The Evidence

From 1:00 p.m. to 4:00 p.m. on the afternoon of December 29, 2011, plaintiffs, three distinguished officers of the Mocksville Police Department (MPD), were summarily fired by the Town, through its administrative chief of police, Cook, and

4

the Town Manager, Bralley, because they had reported corruption within the MPD to the Governor's Office and requested an investigation. In terminating the three officers for their reports, Cook, with the full approval of defendant Bralley, violated the plaintiffs' rights to free speech. The evidence leading to the verdicts against defendants is summarized below and in the prior opinion of this Court.

Since 2005, when he was initially appointed as administrative chief of police of the MPD, Cook's leadership of the MPD caused significant turmoil, including racial tension, JA 1437; concerns regarding Cook's failure to obtain law enforcement certification, JA 1469; his drinking, JA 1210; and financial mismanagement and misconduct. JA 1210.

In the months leading up to November 28, 2011, Cook was closing ranks around his inner circle of those who shielded him. His move culminated with a "reorganization" of the MPD on November 21, 2011, resulting in the demotion of Officer Hunter, a 27-year veteran of the MPD, and one of two African-American officers of the force, JA 1493-1496, subordinating him to his junior white counterpart, Matthews, and relegating him to a position in which his primary duty was to oversee the inventory of vehicles, stripping him of all supervisory responsibilities. JA 1493-1494.

After the reorganization, plaintiffs and others believed that the changes held ominous signs for the community of Mocksville and the MPD. Frustrated by the

5

failure of their internal efforts to resolve the issues, and the perception that the conditions surrounding the MPD were deteriorating, five officers, including the three plaintiffs, met to discuss the issues. JA 1233-1234. They decided to seek an external investigation of the corruption of the MPD, and for security reasons, purchased a disposable cellphone ("Tracfone") so that the officers could communicate with each other concerning their actions. JA 1502-1503, 1507.

On December 14, 2011, plaintiffs called the Governor's Office on the Tracfone. They spoke to an employee of the department, reported specific examples of corruption, and expressed their fear of retaliation. JA 1249-1257. On her advice, plaintiffs agreed to the assistance of the State Bureau of Investigation (SBI), and understood that an agent from the Raleigh office would be assigned to the investigation, as opposed to a local agent who had close relations with the chief. JA 1513, 1250-1251, 1963.

During the week of December 19, 2011, Detective Medlin was at MPD working when he saw local SBI Agent Smith walking down the hall, approaching Matthews. JA 1258-1260. Medlin observed Smith who had been assigned to investigate plaintiffs' reports to the Governor show a piece of paper to Matthews, and then heard Matthews ask the administrative assistant to call Cook, and shortly thereafter, the two left. JA 1260.

Within a short time, two calls were made to the Tracfone, one from MPD Detective Turrentine, who reported to Matthews, and the second from Smith. JA 1515-1516. Given the relationships between Smith, Matthews and Cook, plaintiffs refused to answer or respond to the calls, and, through fear, disposed of the Tracfone. *Id.*

Nevertheless, defendants confirmed plaintiffs' identities within the next week by tracing the Tracfone number through local law enforcement databases, and through the Town's phone records, which became available on December 27, 2011. After establishing the connection between the three plaintiffs and the Tracfone, Bralley and Cook met and decided to terminate plaintiffs, and did so on December 29, 2011. JA 2381, 2415, 2420.

Other facts of record appear in this Court's summary of evidence[2] in its earlier opinion and in the arguments below.

## Procedural History

On April 5, 2012, plaintiffs filed this action seeking damages, pursuant to federal and state law, for violations of their constitutional rights. JA 44. Following discovery, defendants filed their motion for summary judgment as to all of plaintiffs' claims. JA 89-91. Upon consideration, the district court ultimately denied summary

---

[2] While the Court's earlier opinion is based on summary judgment evidence, virtually all of the evidence summarized was presented to the jury at trial.

judgment to the individual defendants, denied summary judgment to the Town on plaintiffs' state law claims, but granted summary judgment to the Town as to plaintiffs' § 1983 claims. JA 1114, 1142. Defendants appealed to this Court, which affirmed the Court's ruling. *Hunter,* 789 F.3d at 389.

Following this Court's decision, the case was tried before a jury, starting May 2, 2016. The jury returned a verdict on May 11, 2016, awarding damages to all plaintiffs in the approximate amount of $4.1 million. JA 2502.

On June 30, 2016, plaintiff filed Plaintiffs Motion for Judgment and Equitable Relief. JA 2508. On August 12, 2016, the district court entered its order, denying reinstatement to all plaintiffs, and substantially reducing plaintiffs' front pay awards. JA 2637.

On November 22, 2016, plaintiffs filed Plaintiffs' Motion for Reconsideration of Equitable Relief of Reinstatement of Plaintiffs Donathan and Medlin, with supporting evidence. JA 2720-2736.

On December 6, 2016, the Interlocal Risk Financing Fund of North Carolina (IRFFNC or "the insurance company") filed its motion for intervention to address issues raised as to its coverage of defendants. JA 2737.

On February 21, 2017, the court entered its order granting reinstatement to plaintiff Donathan, denying reinstatement to plaintiff Medlin, granting intervention

8

to IRFFNC, limiting coverage of the insurance policy to the minimum limit for one claim of $1 million, and dismissing plaintiffs' state constitutional claims. JA 2807.

On March 3, 2017, the district court entered Judgment incorporating its prior orders. JA 2851. Plaintiffs timely filed Plaintiffs' Notice of Appeal on March 23, 2017. JA 2857.

## Rulings Of The District Court

In their arguments below, plaintiffs contest the following rulings of the district court:

1.    Grant of summary judgment to the Town on October 21, 2013, as to plaintiffs' 42 U.S.C. § 1983 claims, JA 1123;

2.    Denial of reinstatement and reduction of front pay to plaintiff Medlin, JA 2637, 2807, 2851;

3.    Determination that intervenor's insurance policy provided only minimum coverage of $1 million for the aggregate of plaintiffs' claims, JA 2637, 2807, 2851; and

4.    Dismissal of plaintiffs' North Carolina state constitutional claims, JA 2637, 2807, 2851.

## SUMMARY OF ARGUMENT

The insurance policy (Policy), drafted by intervenor, promised insurance coverage to the defendant Town (and its third party beneficiaries, the plaintiffs) for

its liability for unlawful employment actions. The Policy promises up to $3,000,000 ($3M) for all claims of all persons under its Annual Aggregate, and up to $1,000,000 ($1M) for each claim of a person making claims under its Each Claim Limit.  While the claims of a single individual for the "same or interrelated acts of one or more insureds" could be combined, the policy language chosen by intervenor does not permit the combining of claims of multiple persons. In its efforts to limit the judgments of the three plaintiffs to a single Each Claim Limit, the intervenor seeks to add language to the operative provision of the Policy. The district court violated established rules of construction of insurance policies in favoring the interpretation of the insurance company limiting coverage.

In the trial below, the jury found that the individual defendants, acting in the course of their employment, violated plaintiffs' constitutional rights, as guaranteed by 42 USC § 1983. JA 2502. The evidence presented at summary judgment establishes that the individual defendants acted as final policymakers in personnel matters and in the discipline of police officers under the delegation of authority from the town council. Accordingly, the defendant Town should be held liable for the judgments of the plaintiffs.

The North Carolina Supreme Court has established that if the application of sovereign immunity by a municipality bars adequate relief under alternative state law claims, then the North Carolina Constitution should apply to provide relief to

10

those who have been denied their state constitutional rights. In the event that the insurance coverage purchased by the Town is found limited to minimum coverage, insufficient to provide adequate relief, then plaintiffs should recover the balance of their judgments from the defendant Town.

Officer Jerry Medlin, like the other plaintiffs, was denied his constitutional rights when the defendants terminated his employment. Unlike the others, Officer Medlin has been deprived of *make-whole* remedies in the denial of his reinstatement, and the reduction of his front pay. This deprivation constitutes an abuse of discretion on the part of the district court.

## ARGUMENT

I.    **WHEN AN INSURANCE POLICY EXPLICITLY LIMITS COVERAGE FOR DAMAGES OF MULTIPLE PERSONS BY A $3 MILLION AGGREGATE, THE DISTRICT COURT ERRED BY USING THE CLAUSE ON THE "EACH CLAIM LIMIT," WHICH APPLIES TO A SINGLE CLAIMANT AND HIS LOSS, TO CREATE A $1 MILLION LIMIT FOR THE DAMAGES OF MULTIPLE PERSONS; THE DEFENDANT TOWN HAS WAIVED ITS IMMUNITY TO THE EXTENT OF ITS "ANNUAL AGGREGATE LIMIT" OF $3 MILLION TO BE APPLIED TO THE JUDGMENTS IN THIS ACTION.**

The jury found that the Town, through two individual defendants, wrongfully terminated three officers, plaintiffs Hunter, Medlin, and Donathan, because of each man's exercise of protected speech. Each plaintiff brought several claims against the defendants, each seeking damages for his individual loss. Each officer recovered substantial damages through three independent verdicts of the jury, and through order and judgment by the district court.  JA 2502-2507; 2851-2856.

11

While the Town generally claimed immunity from liability for the acts of its officials, the Town had purchased an insurance policy (Policy), which waived its immunity to the extent of its coverage.  N.C.G.S. §160A-485; *Combs v. Town of Belhaven*, 106 N.C. App. 71, 73, 415 S.E.2d 91, 92 (1992).  The parties disagree, however, on how the coverage applies to the claims of the three plaintiffs, called "persons" under the Policy, against the "insureds" – the Town, Chief Cook, and Town Manager Bralley.

The following discussion first applies the language of the Policy to hypothetical facts related to this case to illustrate why the coverage in this case is $3 million, the Annual Aggregate Limit.  Following the illustrations, plaintiffs demonstrate that every principle of law relating to the interpretation of insurance contracts supports this plain reading of the Policy.

The standard of review of this issue is *de novo*.  *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.,* 276 N.C. 348, 354, 172 S.E.2d 518, 522, (1970) (interpretation of insurance language is an issue of law, to be determined by the court, and reviewable *de novo*).

### A.    The Policy:  The Declaration and Limits of Insurance

The purpose of the Policy is to protect the Town from liability for "employment wrongful acts." Policy, §I, ¶1, JA 2704. ("We will pay sums that the insured becomes legally obligated to pay as damages resulting from 'claims,' to

12

which this insurance applies, against insured by reason of 'employment wrongful

acts'").  A "Claim" means "a demand received by the insured for money damages

…filed against the insured arising out of 'employment wrongful act(s)' to which this

insurance applies."  Policy, §III, ¶5, JA 2704.  "Employment wrongful acts" includes

the "termination of employment" and other adverse actions taken with respect to a

single employee. Policy, §VI, ¶7, JA 2713.  The Policy explicitly covers the Town,

as well as its "employed officials... [and] employees, … for their acts in the course

and scope of their employment." Policy, §II, ¶ b, c, JA 2707.

The Declarations of the Policy and the Limits of Insurance provide the

language determining the coverage issue.

**Limits of Insurance**

| | |
|---|---|
| Each Claim Limit | $1,000,000 |
| Annual Aggregate Limit for all Claims | $3,000,000 |
| Deductible (Each Claim) | $5,000 |

JA 2683.

"**Section III.  LIMITS OF INSURANCE:**

1.  The Limits of Insurance shown in the Declarations and the rules
    below fix the most we will pay regardless of the number of:

    a. Insureds;

    b. "Claims" made or "suits" brought; or

    c. Persons or organizations making "claims" or binging "suits."

13

2. The Annual Aggregate Limit is the most we will pay for all damages.

3. Subject to 2. above, the Each Claim Limit is the most we will pay for all loss arising out of any "employment wrongful act(s)" covered by this policy. "Claims" based on or arising out of the same act or interrelated acts of one or more insureds shall be considered a single "claim.""

JA 2708.

### B.    Plain Language Application to the Facts

The following illustrations, similar to the facts of this case, demonstrate how the plain words of the Policy provide $3 million for the coverage of multiple *persons* making *claims* against various actors who are *insureds* and for whose *employment wrongful acts* the Policy provides liability coverage.

Assume that during the policy year, one person, Police Officer A, claimed that two officials, Insured 1 and Insured 2, who were employed by a city covered by the Policy, committed employment wrongful acts against him, including separate acts of suspension and discharge because Officer A exercised his first amendment rights. Assume also that Officer A proved his case, and that the jury calculated his damages at $2 million; and that the city has not paid for other claims that would cause the total claims to exceed a total of $3 million during the annual policy period.

The Declaration of the Policy tells us that the Policy will pay $1 million if Officer A's action against the city involves a single claim, and that the Policy will pay a maximum of $2 million for the city's liability for all of his claims.    To

14

determine whether Officer A's action against the city involves a single claim or multiple claims, we turn to Section III. Section III, ¶1 tells us that the Declarations limit the coverage, regardless of the number of insureds, claims, or persons. Under the facts of the illustration, we have two Insureds (Insured 1 and 2), two claims (suspension and wrongful discharge), and a single person making claims (Officer A). Paragraph 2 states that the $3 million Aggregate is the most the insurer will pay during a policy period regardless of the number of insureds, claims, or persons. Paragraph 3 tells us, keeping in mind the $3 million maximum for the policy period, and regardless of the numbers of insureds, claims, or persons, that $1 million is the maximum the insurer will pay for *each claim* for all *loss* arising out of *"employment wrongful act(s)"* that the Policy covers. To answer the question whether Officer A has one claim or several claims, we consult the second sentence. Officer A's claims for suspension and termination are not a result of the "same" act of an insured; however, if the suspension and termination arise out of acts by one or more insureds that are "interrelated"—for example, progressive disciplinary actions by Insureds 1 and 2 for the same incident of protected speech—then the claims may be combined and considered a single claim. In that event, the Policy provides $1 million coverage, not $2 million, for the claims of Officer A, which claims ¶3 may combine as a single claim.

15

Now assume that during the policy year, five persons, Officers A, B, C, D, and E claimed that two officials, Insured 1 and Insured 2, employed by the city, committed employment wrongful acts against them. Assume that the employment wrongful acts consisted of suspension and wrongful discharge against Officers A, B, C, and D because they exercised their first amendment rights to speak out against discriminatory acts against Officer E. Assume that Officer E claims that the employment wrongful acts consisted of demotion, because of his race, and wrongful termination and blacklisting because he exercised his first amendment rights to object to discrimination. Assume also that Officers A, B, C, D, and E all proved their cases, and that the jury calculated their damages at $12 million - $2 million each for Officers A, B, C, and D; $4 million for E.

The Declaration of the Policy tells us that the Policy will pay up to $1 million to each of the five officers if each person's action against the city involves a single claim, and that the Policy will pay a total of $3 million for the city's liability for the employment wrongful acts against all officers, A, B, C, D, and E. To determine whether each Officer's claims against the city constitute a single claim or multiple claims, we turn to Section III. Section III, ¶1 tells us that the Declarations limit the coverage, regardless of the number of insureds, claims, or persons. Under the facts of the illustration, we have two Insureds (Insured 1 and 2), several claims (suspension and wrongful discharge of four persons; demotion, wrongful discharge

16

and blacklisting of one person), and five persons making claims (Officers A, B, C, D, and E). Paragraph 2 reminds us that the $3 million is the most the insurer will pay during a policy period regardless of the number of insureds, claims, or persons. Paragraph 3 tells us, keeping in mind the $3 million maximum for the policy period, that regardless of the number of insureds, claims, or persons, that $1 million is the maximum the insurer will pay for *each claim* of a person for all *loss* arising out of *"employment wrongful act(s)"* that the Policy covers. To answer the question whether the claim of each officer is a single claim or multiple claims, we consult the second sentence: the claims for suspension and termination may involve only four claims, a single claim for each Officer (A, B, C and D), if the claims of each officer arise from acts by one or more insureds that are *interrelated*—as above, progressive disciplinary actions for the same speech. In that event, there are only four claims, with each of these persons having a single claim under the Policy. As for Officer E, even though he has three claims, based on separate acts of the Insured 1 and 2, if all or any of his claims arise out of the interrelated acts of Insured 1 and Insured 2, those claims would be considered a single claim—i.e., Officer E's claims for demotion because of his race may constitute one claim based on an unrelated act of Insured 1, while his other two claims based on his protected speech may be considered a single claim if based on interrelated acts by Insured 2, for a total of two claims for Officer E. The four claims of Officers A, B, C and D would each be subject to the Each

17

Claim Limit of $1M; Officer E would be subject to an Each Claim Limit for each of two claims; and all five police officers are limited to the $3M Annual Aggregate.

Applied to the facts of this case, the jury awarded $4.1 million to Hunter, Medlin, and Donathan. Although each person made several claims against the Insureds Town, Bralley, and Cook, based on three separate terminations, the interrelated acts of Insureds Town, Bralley, and Cook *as to each officer* meant *each officer* was subject to the "Each Claim Limit" of the Policy, limiting each person's claim to $1 million, for a total of three claims of $1 million each. The Annual Aggregate of $3 million is available to cover the three claims.

### C. Traditional Rules of Interpretation of Insurance Contracts applied to the Plain Intent in the Structure and Language of the Policy

Every principle of law supports the above common sense interpretation of the language related to coverage in this contract of insurance. First, traditional rules of interpretation emphasize that coverage is favored and exclusions and limitations on coverage are disfavored in the law. Second, the structure and plain language of the policy reflects the drafters' intent that multiple claims of multiple persons are subject to the Annual Aggregate of Section III, ¶2, and multiple claims of each individual person are subject to the Each Claim Limit in ¶3.

### 1. The Law of Interpretation of Insurance Policies

Based on traditional rules of construction of insurance policies, each plaintiff's loss resulting from an independent "employment wrongful act" constitutes a separate

18

claim subject to the Each Claim Limit of $1M. Insurance policies, like any contracts, must be construed according to the intent of the parties, which may be determined through the language of the agreement, as well as the conduct of the parties. *Fulford v. Jenkins*, 195 N.C. App. 402, 408; 672 S.E.2d 759 (2009). However, special rules of interpretation apply to insurance policies, all of which favor the insured and its third party beneficiaries (plaintiffs). In *City of Greenville v. Hayward*, 130 N.C. App. 271, 274, 275 502 S.E.2d 430, 432 (1998), the North Carolina Court of Appeals summarized the "well-established rules of insurance policy construction":

> "First, "an insurance policy is a contract between the parties which must be construed and enforced according to its terms." [Citations omitted]. The court is obliged to use the definitions supplied in the policy to determine the meaning of words contained in that policy. [Citation omitted]. "In the absence of such definitions, non-technical words are to be given a meaning consistent with the sense in which they are used in ordinary speech." [Citation omitted].
>
> "An ambiguity exists when the language used in the policy is susceptible to different, and perhaps conflicting interpretations." [Citations omitted]. Any ambiguity must be strictly construed in favor of the insured. [Citation omitted]. "'Exclusions from and exceptions to undertakings by the company are not favored, and are to be strictly construed to provide the coverage which would otherwise be afforded by the policy.'" [Citation omitted]."

*See also*, *Durham City Bd. of Educ. v. National Union Fire Ins. Co.*, 109 N.C. App. 160, 426 S.E.2d 451, 455 (1993) (insurance policy must be construed with reference to the purpose of the entire policy); *Harleysville Mut. Ins. Company v. Buzz Off Insect Shield L.L.C.*, 364 N.C. 1, 9-10, 692 S.E.2d 605, 612 (2010) (policy provisions

19

that extend coverage must be liberally construed in order to provide coverage wherever possible by reasonable construction); *Washington Hsg. Auth. v. North Carolina Hsg. Auth.. Risk Retention Pool*, 130 N.C. App. 279, 281, 502 S.E.2d 626, 628 (1998) (upon any ambiguity, "the policy must be interpreted in a manner which extends, but never takes away, coverage"); *Maddox v. Colonial Life & Acc. Ins. Co.*, 303 N.C. App. 650, 280 S.E.2d 908 (1981) ("Exclusions from and exceptions to undertakings by the company are not favored, and are to be construed to provide the coverage which would otherwise be afforded by the policy").

## 2. The Common Sense Interpretation of Section III

Applying these principles of interpretation, and acknowledging the obvious – that the drafters know how to exclude coverage when they intend to do—§III reflects the intent to apply the Annual Aggregate to the damages of multiple persons, and the Each Claim Limit, as defined in ¶3, to the claims and loss of a single party.  This conclusion follows from:

    a.    the overall structure of Section III;

    b.    the use of the singular "each" and "loss" in the first sentence of ¶3, and the plural reference to "claims," "acts," and "insureds" in the second sentence of ¶3;

    c.    the limited use of the word "interrelated"; and

    d.    the rule of *in pari materia*.

20

In all of these ways, the Policy provides for aggregating the "damages" of "persons" only in ¶2 and for combining "claims" for a claimant's loss in ¶3, with no provisions for aggregating "persons."

> ### a. The structure of the Declarations and Section III distinguishes between the "damages" of multiple persons in ¶2 and the claims of a single claimant and his loss in ¶3.

The structure of the Declarations and Section III emphasize the distinction between damages of multiple persons on the one hand, and claims for the loss of a single person on the other, by treating ¶¶2 and 3 of Section III as two separate, self-contained rules. One rule authorizes "aggregating" damages of persons, the other refers only to the loss of a single claimant, with no mention of "aggregating." Paragraph 2, the Annual *Aggregate* in the Declarations and ¶2 of §III, establishes "the most we will pay for *all damages,*" aggregating *all* claims for *all persons* subject to the limit of $3 million during the policy period. The *Each Claim* Limit in the Declarations and ¶3, on the other hand, limits the insurance company's exposure for a single person's claim – "the most we will pay for all [singular] *loss*"—to $1 million.

The rule provided in ¶1 applies in the same way to both of the separate, self-contained rules of ¶¶ 2 and 3. Paragraph 1 of Section III clarifies that the limits of the rules provided in ¶¶2 and 3 apply "regardless of the number of" insureds, claims, or persons making claims. Thus, the *rule* of the Annual Aggregate of $3 million in

¶2 applies regardless of the number of insureds, claims, or persons making claims. Likewise the *rule* of the "Each Claim Limit" of $1 million applies to each claimant regardless of the number of insureds, claims, or persons making claims. Thus, whether there is one claimant, three (as in this case) or 10, all are limited by the rules of the Annual Aggregate in ¶2 and, the claims of each are limited by the "Each Claim Limit" in ¶3. Only in ¶2 does the Policy authorize aggregating the damages of multiple persons, as the use of "aggregate" in ¶2 and its absence in ¶3 make clear.

> **b.    The wording of ¶3, using the singular "each" and the singular "loss" in the first sentence, especially in conjunction with the plural "act(s)," "claims," and "insureds" of the second sentence, make clear that ¶3 refers to a single claimant.**

The plain language of ¶3 refers to a single claimant. First, the first sentence of the two-sentence rule of ¶3, serves as the topic sentence for the paragraph. In that first sentence, ¶3 refers to the singular "*each*" in "*Each* Claim Limit." Also in that first sentence, ¶3 refers to the singular word "*loss*," clearly indicating the *singular loss of a single "claimant,"* rather than the multiple losses or *damages of multiple "persons*."

The second sentence of the two-sentence paragraph, under certain circumstances, imposes a further limit on the claim of a single claimant, that is, when the person's claim arises out of the same or interrelated acts of one of more insureds. This second sentence, unlike the first sentence, refers to plural *insureds*, but not to

plural "persons" or claimants. Courts have emphasized the significance of the insurer's use of the singular, rather than the plural, particularly when it uses the singular and the plural in the same clause. In *Beaufort County Sch. Dist. v. United Nat'l In. Co.*, 392 S.C. 506, 709 S.E.2d 85 (2011), the closest case on point, for example, the South Carolina court found that claims for the sexual abuse of seven victims by a single music teacher in the school constituted seven different claims for insurance purposes. As in this case, the insurance company argued that because the same perpetrator (perpetrators, in the case before the Court) committed the wrongful acts against different victims, the victims' claims constituted a single claim under the policy. The court of appeals of South Carolina rejected that interpretation, in part because the definition of a "claim" did not refer to multiple victims, while the definition of "claim" used the singular *and* plural to refer to the act(s) and to the perpetrator(s)." *392 S.C. at 517-18, 709 S.E.2d at 91*. The court explained that "the close proximity of the singular and plural uses" of the terms at issue "compels the conclusion [the insurance company] intended this difference." *Id.   See also, Lexington Ins. Co. v. Lexington Healthcare Group, Inc.,* 311 Conn. 29; 84 A.3d 1167 (2014) (multiple victims of fire in nursing home presented multiple claims); *Morden v. XL Specialty Ins. Co.*, 2016 U.S. Dist. LEXIS 46201 (D. Utah 2016) (multiple investors presented multiple claims against the same defendant for negligence in managing and investing their accounts).

23

Similarly, in this action, the only reference to the victim, or "person" covered, is in the reference to his "loss," using a singular noun. Only in the second sentence is there any reference to multiple people, and then only to multiple perpetrators: the "insureds." While the clause uses the plural for "employment wrongful act(s)," "claims," and "insureds," it does not use the plural for the victims, or persons. This language demonstrates that IRFFNC intended this difference, and did not reserve the right to aggregate the damages of persons bringing claims, except in ¶2. *Cf. Barr v. Colorado Ins. Guar. Ass'n*, 920 P.2d 102 (1995) (in action brought by directors seeking reimbursement of amounts paid to Corporation for the improper approval of a loan, court found that all claims of the directors would be deemed one claim; Limit of Insurance clause expressly stated that "*losses*" from the same or related acts would be treated as single claim).

For a related reason, ¶3 clearly refers to a single claimant, whose claims might be combined into a single claim but whose claims cannot be aggregated with the claims of another person. The liability that this policy covers is liability incurred for "employment wrongful acts." The "loss" to which ¶3 refers, then, is "loss" giving rise to a "claim" "arising out of" "any employment wrongful act(s)." One claimant does not suffer "loss" for employment wrongful acts directed against another person. Accordingly, the loss must be caused by the termination of a single person, or by other "interrelated" acts by one or more insureds, which are committed against that

24

person, such as demotion, failure to promote, retaliatory action, discipline, "discrimination or other employment-related acts." *See Policy*, §VI, ¶7, JA 2713 (definition of "employment wrongful acts"). *Durham City Bd. of Educ. v. National Union Fire Ins. Co.*, 109 N.C. App. 152; 426 S.E.2d 451 (1993) (arising out of means "caused by"). Clearly, a single claimant, such as plaintiff Hunter, does not incur a "loss" because of the termination of plaintiff Donathan.

In its efforts to deny the plain meaning of the terms it drafted, the intervenor is asking this court to rewrite the policy to achieve the result it wants. The intervenor asks this court to interpret the second sentence of the rule of the "Each Claim Limit" not only to combine the multiple claims of a single claimant into a single claim, but also to aggregate the "damages" of multiple persons, a limit provided for only in ¶2. In order to achieve such an interpretation, the intervenor asks the court to read into the policy language that is not there, as follows:

> "… 'Claims' based on or arising out of the same act or interrelated acts of one or more insureds [***against one or more persons***] will be considered a single claim."

As stated above, the drafters of insurance policies know how to limit or exclude coverage when they intend to do so. Conversely, traditional rules of construction emphasize that the courts will not insert words into a policy to exclude or limit coverage that the insurance drafters failed to include. *Tyler v. Nationwide Mut. Ins. Co.*, 101 N.C.App. 713, 714-15, 401 S.E.2d 80, 81 (1991) ("Since the

insurance company selected the words used in this policy, any ambiguity or uncertainty as to their meaning must be resolved against the company and in the policyholder's favor"); *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.,* 276 N.C. 348, 354, 172 S.E.2d 518, 522, (1970) ("If such a word has more than one meaning in its ordinary usage and if the context does not indicate clearly the one intended, it is to be given the meaning most favorable to the policyholder, or beneficiary, since the insurance company selected the words for use").

The intervenor, which "selected the words used in the policy," asks this court to ignore the rules applicable to insurance contracts and to insert critical language that would re-define the "Each Claim Limit," limiting coverage beyond the explicit limits. The intervenor's position, adopted by the district court, runs counter to every rule of interpretation of insurance policies.

> **c.    The insurance company used the word "interrelated" to allow, under limited circumstances, the combining of multiple claims of a single claimant.**

As explained above, the intervenor asks this court, ignoring rules applicable to insurance contracts, to insert language that the drafter did not use to limit coverage by aggregating the claims of multiple persons outside of ¶2. The district court reached a similar result – aggregating the claims of multiple persons in ¶3 – by extrapolating an undefined term from an unrelated section of the policy to broaden the definition of a narrow, explicit term in Section III. In this way, the court used a

loose, imprecise reading of the policy in clear violation of the rules on interpreting insurance contracts to achieve a result that further limited coverage.

As explained above, the second sentence of ¶3 does not broaden the scope of the first sentence of ¶3, which clearly refers to single claimant and the singular "loss" that the claimant suffers.  Rather, the second sentence of ¶3 recognizes that a further limitation on a single claimant might apply under certain circumstances, circumstances that would authorize the combining of multiple claims of that single claimant.

The term "interrelated" is used in the second sentence of ¶3 to refer "the interrelated acts of *one or more insured*," *not* the interrelated acts "*against one or more persons*." In short, by the terms of the policy language, the interrelationship is that of the insureds' acts – acts of the Town and two individual defendants in this case – not the interrelationship of plaintiffs' claims.

Clearly, the policy language simply means that *a single plaintiff* cannot split into separate claims the acts of multiple insureds when the insureds' acts giving rise to the claims are interrelated.  In the facts of this case, since the acts of the multiple insureds – defendants Town, Cook, and Bralley – against plaintiff Hunter resulted in plaintiff Hunter's demotion, harassment, and termination, those acts may have been "interrelated."  If so, all of plaintiff Hunter's claims based on these acts should be deemed a single claim, subject to the "Each Claim Limit." But the district court,

in effect, lifted the word "interrelated" out of context and applied it to plaintiffs' separate claims, not as it is clearly meant to apply.  While the term is undefined in the Policy, the district court adopted an expansive definition of the term and concluded that since the terminations of the three plaintiffs all arose from their concerted free speech, the term somehow makes the "aggregating" under ¶2 also apply to ¶3.

Again, the closest case on point, *Beaufort County Sch. Dist. v. United Nat'l In. Co.*, 392 S.C. 506, 709 S.E.2d 85 (2011), refused to let the undefined terms of "related" and "interrelated" to aggregate the claims of multiple persons.  In *Beaufort County Sch. Dist.,* the insurance company argued that the claims of seven victims of sexual assault by a single perpetrator should constitute a single claim since the acts were "related."  The court of appeals rejected the aggregating of the claims of multiple persons, and interpreted the language to limit "each victim to one claim, even if they were subjected to abuse multiple times, and finding one claim per victim."  392 S.C. at 518, 709 S.E.2d at 91.  The South Carolina court of appeals also relied on the maxim that "where the words of an insurance policy are capable of two reasonable interpretations, the interpretation most favorable to the insured will be adopted, citing *Quinn v. State Farm Mut. Auto. Ins. Co., 238 S.C. 301, 304, 120 S.E.2d 15, 16 (1961)*.  Instead, the district court in this case imposed a strained

reading to limit coverage, which the law applicable to insurance contracts does not allow.

The intervenor and the court below tried to distinguish *Beaufort County Sch. Dist.* by ignoring the ways that the policy language at issue in this case precludes aggregating the claims of multiple persons even more clearly than the language at issue in *Beaufort County Sch. Dist.* In the Policy before the Court, the paragraph at issue shows *within the paragraph itself* that the insurance company provided for combining the claims only of a single person. By using the singular "each" and singular "loss" in the first sentence of ¶3, the combining of claims in the second sentence can only apply to the claims of a single claimant. In *Beaufort County Sch. Dist.*, the reference to the singular did not appear within the paragraph in issue. Rather, the court agreed that the reference to the singular in a definition found *in a separate section* should be read into the paragraph in issue. 392 S.C. at 513-19, 709 S.E. 2d at 89-92. If the policy language of *Beaufort County Sch. Dist.* precludes aggregating claims of multiple parties, how much more clearly the policy language at issue precludes aggregating claims of multiple parties.

Even if §III, ¶3 were interpreted to include the claims of multiple persons—which is not supported by the policy language—the claims of the plaintiffs were distinct and separate and were not interrelated. In finding that the claims of the plaintiffs were "interrelated," the district court equated the definition of "related,"

which is defined in §I, ¶1b(3) for purposes of when a claim was made (the deemer clause), with "interrelated" in §III, ¶3 which is not defined in the Policy.  The district court's construction is not supported by the plain words of the Policy.

First, the words are not the same.  As recognized in a line of cases, "interrelated" is a more restrictive term, which must be construed strictly and narrowly since it involves an exception or limitation on coverage.  *See, e.g., Sigma Financial Corp. v. American Intern. Specialty Lines Ins. Co.*, 200 F.Supp. 2d 697 (E.D. Mich. 2001).  Second, even aside from this difference, the difference in context of the two provisions makes them "analytically distinct."  *Beaufort County Sch. Dist.,* 392 S.C. at 519, 709 S.E. 2d at 92.

Finally, the term "interrelated," as applied by the district court is vague and potentially boundless.  Specifically, virtually any "employment wrongful acts" committed by an insured may be "interrelated" in some sense or another. In fact, according to the sworn testimony of the individual defendants, the act of termination committed against each plaintiff was independently decided, and based on different grounds. JA 1821-1822 (defendant Cook: acts were independent of one another and it was "coincidental" that they were taken on the same day). The district court pointed out that although defendants' evidence was based on this theory, plaintiffs' evidence, with which the jury agreed, was that the three plaintiffs were terminated

because of their protected speech. However, the acts against plaintiffs were distinct

and separate in the following respects:

1. The termination letters issued against the plaintiffs, approved by the Town counsel, contained separate and distinct grounds for the defendants' actions. JA 2381, 2415, 2420.

2. The evidence presented by the defendants against each plaintiff concerning the grounds for termination was separate and distinct. For example, the defendants presented volumes of testimony against each plaintiff as to performance issues:

   a. As to Officer Hunter, the issues concerning his demotion (not getting along with and harassing his subordinate officers), his "misconduct" in a drug operation, and his hostile attitude following his demotion and grievance, s*ee e.g.*, JA 1803, *et. seq*.;

   b. As to Officer Donathan, his critical attitude towards his supervising officer, his insubordination in failing to follow instructions, and his excessive use of his cell phone, *see, e.g.,* JA 1787*, et. seq*.;

   c. As to Officer Medlin, his going out of town with Officer Hunter, his using town equipment without authorization, his failure to investigate his cases, and to keep his supervisors aware of the status of his investigations, *see, e.g.*, JA 1814, *et. seq.*

3. Based on the evidence, the jury was instructed and a verdict sheet was prepared for distinct and separate verdicts for each plaintiff. JA 2482, 2502.

4. Based on the evidence and the court's instructions, the jury considered each plaintiff separately as to whether he had been unlawfully terminated, and whether he would have been terminated in any event on other grounds. JA 2482, 2502.

5. Each plaintiff's damages were distinct and independent. JA 2502.

6.  Following trial, the district court found that separate and distinct remedies were appropriate for each plaintiff because of his different circumstances. Accordingly, Officer Hunter was denied reinstatement because he was approaching retirement, and was granted front pay for 3.1 years; Officer Donathan was ultimately granted reinstatement based on his different relations with Town officials; and Officer Medlin was consistently denied reinstatement, based on trial testimony against him, and granted front pay for 1.75 years. JA 2637, 2807.

Accordingly, even if §I, ¶3 were interpreted to combine "the interrelated acts of the insureds" to multiple persons, the evidence does not support the district court's conclusion since each plaintiff was impacted by the acts of the insureds which were, in most respects, unrelated.

### d.  The rule of *in pari materia* requires the provision on the Deductible and Section III to be consistent with each other.

The common sense construction of Section III is bolstered by a related provision of the policy—that providing for the Deductible.  Specifically, the language of Section IV, ¶8 reinforces the conclusion that ¶3 combines the multiple claims of a single person under certain circumstances—when the interrelated acts of one or more insureds give rise to a claim—but does not aggregate "damages" of persons, except for the Annual Aggregate Limit, as follows:

> "The deductible amount stated in the Declarations, if any, applies to all damages sustained *by any person* or organization as a result of any one "claim." "Claims" based on or arising out of the same act or interrelated acts of one or more insureds shall be considered a single "claim.""

(Emphasis added) Policy, §IV, ¶8, JA 2710.

32

The deductible reinforces the proper interpretation of Section III, ¶3.  Based on the plain language of the Deductible provision, the Policy treats each person separately and applies a deductible to "all damages sustained by" that "person." The second sentence clarifies, as in Section III, that the "claims" of each person may be combined into a "single claim" if they arise out of the same or *interrelated* acts of one or more insureds.   But combining the multiple claims of each claimant does not aggregate persons.  The deductible applies to each person, who may have one or more claims against the insurer.

The relation of the Limit of Insurance clause of §III to the Deductible clause of §IV.8 is clearly evident as a matter of legal and common sense.  As the North Carolina courts have held consistently, the provisions of a policy, as a contract, must be construed in *pari materia* to other relevant portions of the policy. *See Dawes v. Nash County*, 357 N.C. 442; 584 S.E.2d 760 (2003); *Maddox v. Colonial Life & Acci. Ins. Co.*, 303 N.C. 648; 280 S.E.2d 907 (1981).   It would make no sense to treat claims by multiple "persons or organizations" as a single claim for purposes of the Limit of Insurance, while treating each claim separately for purposes of applying the deductible. With respect to this action, such disparate treatment would result in all three plaintiffs being subject to a single "Each Claim Limit" for coverage purposes, while the Deductible would be charged against the "loss" of each plaintiff. That result would be both structurally and logically inconsistent.

33

The jury found that in 2011, these three police officers suffered from the employment misconduct of the Town, Chief Cook, and Town Manager Bralley. This Court should not allow a tortured reading of the Policy to inflict still more harm and injustice on these public servants and outstanding law enforcement officers.

II.    **WHEN THE EVIDENCE ESTABLISHED THAT PLAINTIFFS' CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE INDIVIDUAL DEFENDANTS, WHO WERE THE FINAL POLICYMAKERS FOR THE TOWN, AND TO WHOM THE TOWN HAD DELEGATED ALL POWER AND AUTHORITY TO DETERMINE PERSONNEL AND POLICE POLICIES, THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT TOWN OF MOCKSVILLE AS TO PLAINTIFFS' 42 U.S.C. § 1983 CLAIMS.**

The district court granted summary judgment in favor of the Town on plaintiffs' 42 U.S.C. § 1983 claim. JA 1123. Analysis of constitutional violations is a question of law entitled to *de novo* review. *See Garraghty v. Jordan*, 830 F.2d 1295, 1289 (4th Cir. 1987). Plaintiffs contend that this Court should reverse the district court's ruling and enter judgment in favor of plaintiffs on this claim, *see Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664 (7th Cir. 2009) (summary judgment in favor of municipality reversed, and order entered that municipality was liable with remand to determine whether plaintiff retaliated against in violation of her rights); or at minimum, rule that there are issues of fact to be determined by the jury. *See Randle v. City of Aurora*, 69 F.3d 441, 448–50 (10th Cir. 1995).

Under 42 U.S.C. §1983, a governmental employer is responsible for constitutional violations which result from "policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy.*" Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Municipal policy may be found in municipal ordinances, but may also be found in "formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy." *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987). "Municipal liability may also be imposed for a single decision by municipal policy makers." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 485 (1986). As stated by the Supreme Court in *Pembaur*:

> "If the decision … is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible, whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983."

*See also Edwards v. City of Goldsboro*, 178 F.3d 231, 235 (4th Cir. 1999); *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).

Official policy may be proven by omission, in the failure of responsible officials to make policy or enact regulations. *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992); *Avery v. County of Burke*, 660 F.2d 111 (4th Cir. 1981). Liability can also be established when a supervising officer is deliberately indifferent to her subordinate's violation of the employee's constitutional rights. *See, e.g. Shaw*

35

*v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001).

Despite the less exacting standards above, the evidence in the present case establishes that the Town Council made an affirmative delegation of policymaking and decision-making authority to Town Manager Bralley and Chief Cook; that Bralley was the final personnel policymaker and decisionmaker for the Town with respect to the employment of the plaintiffs, and that Cook was the final policymaker of the MPD.

According to the evidence, the Town exercised authority over personnel matters through a personnel ordinance until the late 1980's. JA 665-666. At that time, the town took official action to eliminate its policies and delegate its authority to establish policies and make personnel decisions to its town manager. JA 665-666, 698-706, 953-954. Further, the town officially memorialized that delegation through the Town of Mocksville Code, § 2-4.1 (2003) ("Town personnel shall be employed by the Town Manager within the appropriations for that purpose; the terms of the positions shall be at the will of the Town Manager…"). Subsequently, the town council approved the further delegation of authority to make hiring and firing decisions from the town manager to the police chief (and other department heads), subject to the town manager's oversight. JA 699-701; JA 231, 233, 235. In short, Bralley had unfettered authority to determine the fate of town police officers; and

36

she delegated that authority to Cook, subject to her review.  JA 699-701; 231, 233, 235.[3]

In addition, in 2005, shortly after his appointment, defendant Cook, exercising "the authority of the Chief of Police" of MPD—authority derived from the town council—issued policies for the MPD governing the actions of its police officers.[4] JA 239.  The policies, to which he required strict adherence by his officers, were broad and explicit in their prohibition of potentially protected speech, and particularly speech exposing corruption in the MPD.  JA 281.  *See, e.g.*, Policy 348, *Uncalled-for Remarks*, which prohibits officers from making "any remark in regard to an officer or member of the Department which may bring the Department or any officer or member thereof into disrepute, or subject it or them to any ridicule," requiring instead that "such matter … be brought to the attention of the commanding officer and/or Chief of Police,"  JA 270; Policy 347, *Criticism*, which provides that "[a]n officer shall not publicly criticize … the Department, its policies, or other

---

[3] The district court, in holding the contrary, relies, primarily, on N.C. Gen. Stat. § 160A-164, which provides that the council "*may* adopt or provide for rules and regulations or ordinances concerning" (emphasis provided) personnel issues; however, as the evidence above establishes, the council did not do so, but delegated all authority to establish and implement employment policies, particularly concerning police officers, to Bralley and the department heads, including Cook.  JA 665-666, 699-706, 953-954.

[4] Cook initially adopted the policies, which had been established years before, on a "temporary" basis, but these policies remained in effect at the time of plaintiffs' terminations.

37

officers by speech, writing, or expression in any other manner, when such speech, writing, or other expression is defamatory … or tends to undermine the operation of the Department by impairing its efficiency; or interferes with the maintenance of discipline" or is false, JA 269 and Policy 346, "Conduct unbecoming an officer shall include that which tends to bring the Department into disrepute … or that which tends to impair the operation and efficiency of the Department or officer, *Id*. The Chief retained in himself the sole authority to interpret the policies, JA 239; and officers were prohibited from contacting any "member of the City Council, Mayor, City Manager" or others in authority except "by permission of the Chief." JA 266.

According to Cook, he had the responsibility and authority to "run the department" and to make the decision to fire plaintiffs and he did so. JA 747-749 (Cook Dep.). And while Bralley had the authority to reverse Cook's decisions, JA 340-341; she joined Cook in the "investigation" of the plaintiffs' reports to the Governor's Office, JA 2435; and joined in and approved the decision to terminate plaintiffs in violation of violate their constitutional rights. JA 722-731.

A survey of pertinent caselaw confirms that Bralley and Cook were final policymakers, thus imposing liability upon the Town. *See Flanagan v. Munger*, 890 F.2d 1557, 1569 (10th Cir. 1989) ("For all intents and purposes the Chief's discipline decisions are final, and any meaningful administrative review [by the City Council or City Manager] is illusory."); *Starrett v. Wadley*, 876 F.2d 808,

38

818-19 (10th Cir. 1989) ("Wadley had final authority to set employment policy as to the hiring and firing of his staff" because City did not offer any "meaningful avenues of review"); *Barnett v. Karpinos,* 119 N.C. App. 719, 725, 460 S.E.2d 208, 211 (1995) (Chapel Hill town manager and police chief were final policymakers).  As the court states in *Randle, "*if the sheriff had been delegated final responsibility for establishing employment policy--i.e., if the sheriff was not subject to any meaningful review or constraints--then the county could be held liable for his actions within the grant of his official authority."  *Randle*, 69 F.3d at 448.

In *Edwards vs. City of Goldsboro*, this Court determined that plaintiff adequately pled facts supporting municipal liability:

> "[The] complaint alleges that the City delegated authority to its agents and employees, including Chief Hill and City Manager Slozak, to formulate, develop and administer employment and personnel policies and practices for the City, including those policies and practices that caused [plaintiff] the damages he has alleged.  The... complaint further alleges that the acts complained of and edicts of Chief Hill and City Manager Slozak represent official policy of the City, and that City Manager Slozak's decision to uphold and ratify Chief Hill's decision to deny [plaintiff his rights] was a final decision of the City."

178 F.3d at 245. As in *Edwards*, the evidence establishes that Bralley and Cook were the final policymakers for the Town with respect to their hiring and firing of police officers, and the discipline of officers who spoke out against the chief.[5]

If the court finds that policy was not explicitly delegated to Bralley and Cook, which the evidence shows it was, at the least the evidence establishes that Bralley and Cook were the "*de facto* policymaker[s]," which would be enough to establish liability on the part of the Town, since the Town exercised no "meaningful oversight of … [defendants'] desionmaking process or meaningfully reviewed [their] termination decisions." *Valentino*, 575 F.3d at 678. *See also, Purdy v. Town of Greenburgh*, 178 F. Supp. 2d 439 (S.D.N.Y. 2002) (summary judgment denied as to issue of *who* final policymaker is for personnel decisions in police department); *Gros v. The City of Grand Prairie, Texas,* 181 F.3d 613 (5th Cir. 1999) (summary judgment denied because there was a genuine dispute whether police chief had final policymaking authority); *Weeks v. City of Plano*, 1989 US Dist. LEXIS 2353 (N.D. Ill. 1989).

This evidence demonstrates that plaintiffs were injured by the individual defendants' enforcement of the policies, and the decisions of its final policymakers

---

[5] In support of this point, when Donathan sought out a town council member to appeal to after his discharge, he was sent back to Bralley. JA 152 (Donathan Dec., ¶ 45); JA 113.

40

to terminate plaintiffs because of their protected speech. *Edwards*, 178 F.3d at 235 [6]

This Court should reverse the district court's grant of summary judgment as to plaintiffs' § 1983 claims against the Town.

## III.   THE DECISIONS IN *CORUM* AND *CRAIG* DICTATE THAT TO THE EXTENT IMMUNITY APPLIES TO BAR ADEQUATE RELIEF ON PLAINTIFFS' WRONGFUL DISCHARGE CLAIM, THEY MUST RECOVER ON THEIR STATE CONSTITUTIONAL CLAIMS

Plaintiff should recover on their constitutional claims without adequate relief from their alternative claims. Analysis of constitutional violations is a question of law entitled to *de novo* review. *See Garraghty v. Jordan*, 830 F.2d 1295, 1289 (4th Cir. 1987). In 1992, the North Carolina Supreme Court held that the "doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declaration of Rights" *Corum v. University of North Carolina,* 330 N.C. 761, 785 (1992). With reference to *N.C. Const. art I, § 14,* the court emphasized that, given the import of the rights in question, "[a] direct action against the State for its violations of free speech is essential to the preservation of free speech." *Id.* at 782. The instant case presents identical issues: plaintiffs were terminated for exercising their rights to free speech, and like Corum, are entitled to redress for those injuries.

---

[6] Indeed, in his termination letters to plaintiffs, his memorandum concerning plaintiff Hunter and his explanation to the District Attorney, defendant Cook apparently relied on the above policies. JA 231, 233, 235 (each plaintiff charged with "conduct unbecoming an officer.

41

**Adequacy of Alternative Remedies.** Under *Corum*, plaintiffs are entitled to direct claims under the state constitution if they cannot obtain adequate relief through alternative claims. Merriam-Webster defines "adequate" as "sufficient for a specific requirement; lawfully and reasonably sufficient." As it pertains to the instant case, *adequacy* can only mean the remedy that was awarded by the jury and then modified by the Court. Anything less would be insufficient, given the various doctrines applicable—the *make-whole* relief doctrine, and the "just compensation" doctrine that flows from the constitutional principles on which the *Corum* Court relied. In short, the underlying force behind the various theories driving *Corum* is a remedy that fully compensates the plaintiff for the constitutional violation.

The *Corum* Court cited *Sale v. State Highway & Public Works Com.* 242 N.C. 612 (1955), in which the Supreme Court stated:

> "When the provisions of a constitution, as does ours,…forbids damage to private property, and points out no remedy, and no statute affords one…the common law, which provides a remedy for every wrong, will furnish the appropriate action for the redress of such grievance."

242 N.C. at 618 (quoting *Swift v. City of Newport News,* 105 Va. 108 (1906)). The court determined that the common law must provide claims *and* remedies, and emphasized that "[i]n this State when a person has been deprived of his private property for public use *nothing short of actual payment or its equivalent, constitutes just compensation. The entry of a judgment is not sufficient*" 242 N.C. at 618 (emphasis added).

42

The spirit of *Corum* and *Sale* rejects the notion that a "remedy" might take the form of something less than actual compensation, a judgment that fails to fully compensate the plaintiff. In the present case, appropriate relief—that relief which is adequate under the circumstances—has been fully determined by the jury, with modification by the Court. It would be precisely the injustice that *Sale* and *Corum* rejected to claim that alternative remedies that do not provide actual payment or just compensation are somehow adequate, particularly when the rights addressed are as significant as freedom of speech.

In *Craig v. New Hanover County Bd. Of Educ.* 363 N.C. 334 (2008), the North Carolina Supreme Court reaffirmed *Corum* and held that alternative claims precluded by governmental immunity would not bar a plaintiff from seeking relief directly under the North Carolina Constitution. The court noted the inherent dissonance between the strong holding in *Corum,* that constitutional rights must be protected, and the notion that a claim that did not provide the possibility of relief could be considered "adequate," observing that its holding simply ensures that an adequate remedy must provide the possibility of relief under the circumstances. Here, the language of the excess liability insurance policy and corresponding applicability of sovereign immunity, make relief impossible on plaintiff's common law negligence claim, regardless of his ability to prove his case. *Id.* at 340. The holding of *Craig*—the expansion of constitutional tort actions to provide relief in

43

cases where alternative claims prove inadequate—ensures that a plaintiff has the possibility of relief, that the guarantee of Constitutional rights may not be undermined arbitrarily by factors such as the purchase of liability insurance.

The plaintiffs here present the issue of *adequacy* in a context in which the issue—what is adequate relief—has already been determined by the jury and the district court. Like *Craig*, plaintiffs find themselves without the possibility of *make-whole* relief absent their constitutional claims. Critically, and in contrast to prior North Carolina constitutional cases, the plaintiffs have presented their case, have been successful on the merits, and in the absence of relief through their constitutional claims, will be left with inadequate remedies for constitutional injuries.

Specifically, if the Town's insurance is found to be limited to $1M total for the three plaintiffs' claims—a limitation which is not supported, as argued above—plaintiffs are entitled to a remedy through their constitutional claims to satisfy the requirements of *Corum* and *Craig*. As the court notes in *Craig*,

> "[o]ur constitutional rights should not be determined by the specific language of the liability insurance policies carried…in each county. Allowing sovereign immunity to bar this type of constitutional claim would lead to inconsistent results across this State, as persons in some counties would find themselves in plaintiff's position, with no remedy at all for this type of injury, while others would be compensated. Instead, individuals may seek to redress all constitutional violations, in keeping with the "fundamental purpose" of the Declaration of Rights to "ensure that the violation of [constitutional] rights is never permitted by anyone who might be invested under the Constitution with the powers of the State." *Id.* at 342.

44

As in *Craig,* to allow terms of the insurance policy purchased by the Town to control the nature of the remedy available to plaintiffs whose constitutional rights have been violated is simply untenable, and diminishes the protections of our State Constitution.

*Corum* **caselaw.**  The body of North Carolina caselaw that has flowed from *Corum* and *Craig* is largely inapplicable to the present case, in part, because none of the cases involve a judicial determination of *adequacy*, as provided by the jury and court in this case.  In contrast to the other plaintiffs, the plaintiffs in the instant case have established what adequate relief is in regards to their claims.

Analytically, the constitutional cases in North Carolina that were rejected by the courts fall into two broad categories, neither of which are applicable to the instant case.  The first involves plaintiffs who did not pursue alternative claims that were available.  *Swain v. Efland,* 145 N.C. App. 383 (2001); *Hawkins v. State,* 117 N.C. App. 615 (1995), *Patterson v. City of Gastonia,* 220 N.C. App. 233 (2012).  This line of cases is inapplicable to the present case, since the plaintiffs have pursued and prevailed on all claims.

The second broad category of claims that has been rejected by the courts are characterized by plaintiffs who pursued constitutional claims because of the difficulty of alternative claims.  Cases that comprise this category are exemplified by *Glenn-Robinson v. Acker,* 140 N.C. App. 606 (2000); *Debaun v. Kuszaj,* 228 N.C.

App. 567 (2013). The holdings of these decisions provide that direct state constitutional claims are not a substitute for alternative claims which impose difficult affirmative defenses. The plaintiffs in the instant case did not attempt to avoid a higher burden, but followed the only path that provides the possibility for an adequate remedy.

Clearly, the threshold above is not met if plaintiffs' total remedies are capped at $1M, an amount insufficient to compensate plaintiffs for their compensatory damages alone. As held in *Craig*, sovereign immunity must not stand as a bar to the redress of state constitutional violations, and likewise, the language in insurance policies and, indeed, the decision to purchase insurance must not dictate remedies. If it did, the citizens of North Carolina would find themselves with varying protections for constitutional rights, a reality the *Craig* court flatly rejected.

This Court should reverse the dismissal of plaintiffs' state constitutional claims.

**IV.   THE DISTRICT COURT ERRED IN DENYING TO OFFICER MEDLIN THE PREFERRED REMEDY OF REINSTATEMENT OR ALTERNATIVELY, ADEQUATE FRONT PAY FOR THE BLATANT VIOLATION OF HIS CONSTITUTIONAL RIGHTS**

Both reinstatement and front pay are subject to an abuse of discretion standard of review. *See Dotson v. Pfizer,* 558 F.3d 284 (4th Cir. 2009).

Officer Medlin was denied reinstatement by the district court in its order on August 12, 2016, and then, upon reconsideration, on February 21, 2017. JA 2637;

2807. At the time of reconsideration, any factors weighing against reinstatement had been resolved, as evidenced by the reinstatement of Officer Donathan. JA 2807. Officer Medlin was entitled to reinstatement as the preferred form of make-whole relief, and the district court's denial of reinstatement was an abuse of discretion.

A prevailing public employee who has proven that his employer violated his constitutional rights in terminating his employment is entitled to *make-whole* relief. Such relief includes any equitable relief which the Court may deem appropriate, including the "preferred remedy" of reinstatement to the position from which he was terminated. *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991) (make-whole doctrine applied to ADEA claims); *Squires v. Bonser,* 54 F.3d 168 (3d Cir. 1995) (make-whole doctrine applied to constitutional claims); *Garza v. Brownsville Independent School Dist.,* 700 F.2d 253, (5th Cir. 1983)("reinstatement or hiring preference remedies are to be granted in all but the unusual cases" *Id.* at 255). *See also*, *Blakeley v. Town of Taylortown*, 233 N.C. App. 441 (2014), and *Corum v. University of North Carolina,* 330 N.C. 761 (1992) (equitable remedies, crafted by trial judge, including reinstatement, applicable to state law claims).

The purpose of equitable remedies is to put plaintiffs in the positions they would occupied had defendants not violated their rights. *Koyen v. Consolidated Edison Co.,* 560 F.Supp. 1161 (S.D.N.Y. 1983) ("The manifest purpose of this broad grant of legal and equitable power is to enable the courts to fashion whatever remedy

is required to fully compensate an employee for the economic injury sustained by him.").

**Reinstatement.**    Officer Medlin was entitled to the preferred remedy of reinstatement, and the record makes clear that no legitimate impediments prohibited his reinstatement in February, 2017, when Officer Donathan was reinstated. *Garza v. Brownsville Independent School Dist.,* 700 F.2d 253, (5th Cir. 1983).  The primary obstacle to plaintiffs' reinstatement was the remaining presence of defendant Bralley as town manager.  JA 2637.  However, by November 1, 2016, defendant Bralley was forced to retire from her position, and this "greater obstacle" to reinstatement, according to the district court, was removed.  JA 2720.

The two other issues cited by the district court in denying Medlin reinstatement, for a second time, were animosity created by the litigation, and the lapse of Officer Medlin's law enforcement certification.  First, the unsupported conclusory statement of the police chief who succeeded defendant Cook, Chief Penley, that plaintiffs' reinstatement would create "hostility and antagonism" in the department, and could "jeopardize public safety," is not credible.  JA 2807.  This statement constitutes nothing more than self-serving speculation.  In fact, the chief has never worked with Medlin, and there is no evidence that any officer who testified against Officer Medlin would have any difficulty working with him.  Notably, the district court did not find the above arguments, which were generalized and applied

48

to all plaintiffs, to be persuasive as to Donathan, who was reinstated.  JA 2807.

     In the final order, the court also relied on alleged performance issues raised during the trial to deny reinstatement to Medlin, despite the fact that the jury wholly rejected those allegations through its verdict.  JA 2502, 2807.  Indeed, in ordering reinstatement for Donathan, the court found that the jury "necessarily rejected this conclusion" in reference to the Town's purported rationale for terminating him.  JA 2807.  Likewise, the jury flatly rejected defendants' purported rationale for terminating Medlin, and it is inconsistent and arbitrary to apply different analyses to the two plaintiffs pertaining to those issues.  Further, the court dismisses the notion that potential hostility or animosity should prevent the reinstatement of Officer Donathan, reasoning that "[i]t has been over five years since his termination…Any lingering resentment within the MPD as to Donathan has likely dissipated, and he would start with a new Chief of Police who was not involved in the MPD at the time of the events leading to his termination." JA 2807.  The same analysis that the court applies to Donathan applies to Medlin.

     The court offers two additional reasons for denying reinstatement to Officer Medlin, neither of which is persuasive.  First, the lapse of his law enforcement certification, and second, alleged additional evidence of animosity, ostensibly revealed by two posts on social media.  JA 2807.  As to the first, the notion that Officer Medlin's lack of a valid law enforcement certification—a problem caused

49

by defendants in the unconstitutional termination and subsequent blacklisting of him —is antithetical to the entire notion of *make-whole* relief. The court has the power, and indeed the obligation, to order that defendants cooperate in the process to restore Medlin's certification. Similarly, the posts on social media—one in which he asserted that Mocksville was a "crooked [expletive] of a town," and another in which he questioned law enforcement's actions within an active investigation, (JA 2807) do not provide an adequate basis for denial of this preferred remedy. While Officer Medlin's comments may be regrettable, and he has acknowledged as much, denying him reinstatement based on this mild venting on social media, given the background of this case—the termination, the destruction of his law enforcement career, the financial damages he and his family have endured—is unsupportable. The court's denial of reinstatement of Officer Medlin was an abuse of discretion, and should be reversed.

**Front Pay.** In the absence of reinstatement, the district court should have, at minimum, granted to Officer Medlin substantial front pay as an alternative.

In its order, the court recognizes the factors outlined in *Ogden v. Wax Works, Inc.,* 29 F. Supp. 2d 1003 (N.D. Iowa 1998), and finds that *most* of the factors weigh in favor of front pay. Accordingly, the court acknowledges that Officer Medlin's rank and tenure; his unblemished record, commendations, clearance rate, and the fact that Cook had never fired an officer all weigh in his favor. The court

acknowledges that, but for the termination, Officer Medlin would likely have remained with the MPD indefinitely. The court acknowledges that Officer Medlin was unable to find work despite his extraordinary mitigation efforts, with applications to "over twenty law enforcement agencies for predominantly entry level positions," which he "continued to pursue…for more than a year." JA 2637.

Yet, despite the litany of factors weighing in favor of significant front pay, the district court significantly reduced Officer Medlin's front pay award. In doing so, the court relied heavily on Officer Medlin's age and work-life expectancy, optimistically assuming that, in spite of Medlin's inability to find sufficient work to support himself and his family, his "prospects have only improved as a result of the jury's verdict in this case, as any cloud over his reputation as a result of his termination and this litigation should be lifted." JA 2637. The court's assumption is conjecture, inconsistent with Officer Medlin's long, diligent, and unsuccessful mitigation efforts, and ignores the reality that Medlin was not reinstated *because* of the litigation.

In short, the court's award of 1.75 years front pay for Officer Medlin is clearly inadequate, is arbitrary, unsupported by the law, and inconsistent with the court's own analysis. Indeed, courts have routinely upheld significantly longer awards—in fact, all three cases cited by the court provide longer front pay awards than Medlin received. *See, e.g., Bates v. Board of Education,* 2000 US Dist. LEXIS 4873 (D.

Del. 2000) (award of 17 years front pay to retirement age upheld); *McInnis v. Fairfield Cmtys., Inc.,* 458 F.3d 1129, (10th Cir. 2006).

This Court should reverse the denial of reinstatement to Officer Medlin; or alternatively, vacate the district court's reduction of front pay.

## CONCLUSION

For the reasons stated, plaintiffs respectfully request that this Court:

1.    Reverse the district court's decision concerning the scope of insurance coverage, and rule that the $3M Annual Aggregate is applicable to cover plaintiffs' judgments;

2.    Reverse summary judgment in favor of the Town as to plaintiffs' 42 U.S.C. §1983 claims;

3.    Reverse the court's dismissal of plaintiffs' state constitutional claims; and

4.    Order the immediate reinstatement of plaintiff Medlin, or alternatively, vacate the court's reduction of front pay.

### ORAL ARGUMENT IS RESPECTFULLY REQUESTED

Counsel for Plaintiffs-Appellants

/s/ Robert M. Elliot
Robert M. Elliot (7709)
Elliot Morgan Parsonage, PLLC
426 Old Salem Road
Winston-Salem, NC  27101
Telephone:  (336) 724-2828
Facsimile:   (336) 724-3335
Email:  rmelliot@emplawfirm.com

/s/Reynolds Michael Elliot
Reynolds Michael Elliot (42806)
Elliot Morgan Parsonage, PLLC
300 East Kingston Avenue
Suite 200
Charlotte, NC  28203
Telephone:   (704) 707-3705
Facsimile:    (336) 724-3335
Email:  michaelelliot@emplawfirm.com

## **Certificate of Compliance With Type-Volume Limitation,**
## **Typeface Requirements, and Type Style Requirements**

    1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [ x ] this brief contains 12,881 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), excepting portions of text appearing as images because they are direct copies from the appendix, *or*

    2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ ] this brief has been prepared in a proportionally spaced typeface using [*state name and version of word processing program*] in [*state font size and name of type style*], *or*

    [ x ] this brief has been prepared in a proportional, serif typeface using *Microsoft Word 2008* with Times New Roman 14 point.

    /s/ Robert M. Elliot
Robert M. Elliot, Attorney for Plaintiffs/Appellants

Dated:    09/11/2017

## CERTIFICATE OF SEVICE

I certify that on September 11, 2017, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

| | |
|---|---|
| Patrick Houghton Flanagan<br>Cranfill Sumner & Hartzog, LLP<br>PO Box 30787<br>Charlotte, NC 28230<br>phf@cshslaw.com<br><br>Counsel for Defendant-Appellee,<br>Town of Mocksville | Norwood Pitt Blanchard, III<br>Crossley McIntosh Collier Hanley & Edes, PLLC<br>5002 Randall Parkway<br>Wilmington, NC 28403<br>norwood@cmclawfirm.com<br><br>Counsel for Defendants-Appellees,<br>Robert Cook and Christine Bralley |
| Phillip M. Van Hoy<br>Stephen J. Dunn<br>Van Hoy, Reutlinger, Adams & Dunn<br>737 East Boulevard<br>Charlotte, NC 28203<br>phil.vanhoy@rvadlaw.com<br>steve.dunn@vradlaw.com<br><br>Counsel for Defendant-Appellee,<br>Town of Mocksville | Cathryn M. Little<br>Little & Little, PLLC<br>PO Box 20789<br>Raleigh, NC 27619<br>cathrynmlittle@aol.com<br><br>Counsel for Intervenor-Appellee,<br>Interlocal Risk Financing Fund of North Carolina |
| Albert M. Benshoff<br>Brough Law Firm, PLLC<br>Suite 200, 1526 East Franklin St.<br>Chapel Hill, NC 28025<br>benshoff@broughlawfirm.com<br><br>Counsel for Defendant-Appellee,<br>Town of Mocksville | |

/s/Robert M. Elliot                    September 11, 2017