# RECORD NO. 17-1374

In The

# United States Court Of Appeals
# For The Fourth Circuit

**KENNETH L. HUNTER; RICK A. DONATHAN; JERRY D. MEDLIN,**

*Plaintiffs – Appellants,*

v.

**TOWN OF MOCKSVILLE, NORTH CAROLINA; ROBERT W. COOK, in his official capacity as Administrative Chief of Police of the Mocksville Police Department and in his individual capacity; CHRISTINE W. BRALLEY, in her official capacity as Town Manager of the Town of Mocksville and in her individual capacity,**

*Defendants – Appellees,*

and

**INTERLOCAL RISK FINANCING FUND OF NC,**

*Intervenor - Appellee.*

_____

**NORTH CAROLINA ADVOCATES FOR JUSTICE; NATIONAL ASSOCIATION OF POLICE ORGANIZATIONS, INC.,**

*Amici Supporting Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO

_____

# CORRECTED BRIEF OF APPELLEES

_____

| | | |
|---|---|---|
| Patrick H. Flanagan | Philip M. Van Hoy | Cathryn M. Little |
| CRANFILL, SUMNER & | Stephen J. Dunn | LITTLE & LITTLE, PLLC |
| HARTZOG, LLP | VAN HOY REUTLINGER ADAMS | P. O. Box 20789 |
| P.O. Box 30787 | & DUNN | Raleigh, NC 27619 |
| Charlotte, NC 28230 | 737 East Boulevard | (919) 856-0006 |
| (704) 322-8300 | Charlotte, NC 28203 | |
| | (704) 375-6022 | |
| Albert M. Benshoff | | |
| BROUGH LAW FIRM, PLLC | | |
| 1526 East Franklin Street | | |
| Suite 200 | | |
| Chapel Hill, NC 28025 | | |
| (980) 622-6440 | | |
| | | |
| *Counsel for Appellee* | *Counsel for Appellee* | *Counsel for Appellee* |
| *Town Of Mocksville,* | *Town Of Mocksville,* | *Interlocal Risk Financing* |
| *North Carolina* | *North Carolina* | *Fund of NC* |

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __17-1374__        Caption: __Hunter v. Town of Mocksville, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Town of Mocksville, North Carolina__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                    ☐YES ☑NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                            ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Patrick H. Flanagan                    Date: 4/7/2017

Counsel for: Defendant Town of Mocksville

## CERTIFICATE OF SERVICE
**************************

I certify that on _____4/7/2017_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Patrick H. Flanagan                                    4/7/2017
      (signature)                                            (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 17-1374 _____ Caption: Kenneth L. Hunter v Town of Mocksville, NC _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Robert W. Cook _____
(name of party/amicus)

_____

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                  ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Norwood P. Blanchard, III                    Date:    04-19-17

Counsel for: Robert W. Cook

## CERTIFICATE OF SERVICE
***************************

I certify that on _____04-19-17_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Norwood P. Blanchard, III                    04-19-17
(signature)                                      (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 17-1374 _____ Caption: Kenneth L. Hunter v Town of Mocksville, NC _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Christine W. Bralley
_____
(name of party/amicus)

_____

who is _____ appellee _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Norwood P. Blanchard, III                    Date:    04-19-17

Counsel for: Christine W. Bralley

## CERTIFICATE OF SERVICE
*************************

I certify that on    04-19-17    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Norwood P. Blanchard, III                              04-19-17
    (signature)                                              (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __17-1374__    Caption: Kenneth Hunter; Rick Donathan; Jerry Medlin v Town of Mocksville

Pursuant to FRAP 26.1 and Local Rule 26.1,

Interlocal Risk Financing Fund of North Carolina ("IRFFNC")
(name of party/amicus)

(admitted as an Intervenor by the Middle District of North Carolina)

who is ___an appellee/intervenor___, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations? ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
    If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: 4/7/17

Counsel for: Interlocal Risk Financing Fund of NC

## CERTIFICATE OF SERVICE
****************************

I certify that on _____3/30/17_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____
(signature)

4/7/17
_____
(date)

-2-

# **TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF IRFFNC'S COVERAGE ISSUE FOR REVIEW......................1

STATEMENT OF THE TOWN'S ISSUES FOR REVIEW ...................................1

STATEMENT OF THE CASE RELEVANT TO THE COVERAGE ISSUE .........2

    Statement of Key Facts Relevant to Coverage Issue.......................................3

THE TOWN'S STATEMENT OF THE CASE ......................................................7

    The Police Handbook Was Not Official Town Policy ...................................7

    The Officers Were Not Precluded from Communicating with the Town
    Council or Town Manager........................................................................9

SUMMARY OF IRFFNC'S COVERAGE ARGUMENT.....................................11

THE TOWN'S SUMMARY OF THE ARGUMENT ............................................12

IRFFNC's ARGUMENT ...................................................................................13

I.    The Officers' Claims Are Based On and Arising Out of the Same
    Act or Interrelated Acts of One or More Insureds and Shall Be
    Considered A Single Claim Under IRFFNC's Policy, Subject to
    a $1,000,000 Limit ...............................................................................13

    A.    Scope of Coverage Provided by IRFFNC to the Town ............13

    B.    IRFFNC's $1,000,000 Limit Applies to Officers' Claims
         and Judgment .........................................................................17

    C.    General Rules of Insurance Policy Construction......................18

i

D. Legal Authority Supports Application of IRFFNC's $1,000,000 Limit ................................................................20

E. The Officers' Arguments Ignore IRFFNC's Plain Policy Language ................................................................23

F. The Officers' Cases Are Factually and Procedurally Distinguishable ................................................................24

G. District Court Properly Applied $1,000,000 Limit to the Officers' Claims ................................................................28

THE TOWN'S ARGUMENT ................................................................28

I. THE TOWN WAIVED IMMUNITY ONLY TO THE EXTENT OF ITS INSURANCE COVERAGE ................................................28

II. THE DISTRICT COURT CORRECTLY RULED THE MOCKSVILLE TOWN BOARD HAD FINAL POLICYMAKING AUTHORITY OVER PERSONNEL ISSUES PURSUANT TO THE EXPRESS LANGUAGE OF N.C.G.S. § 160A-164. ................................................30

III. WHERE THE OFFICERS SUCCESSFULLY AVAILED THEMSELVES OF AN ADEQUATE STATE REMEDY, THE DISTRICT COURT CORRECTLY DISMISSED THEIR CLAIMS UNDER THE NORTH CAROLINA CONSTITUTION ................................................36

IV. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN AWARDING FRONT PAY TO OFFICER MEDLIN BECAUSE REINSTATEMENT WAS INFEASIBLE ................................39

CONCLUSION ................................................................42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s):</u>

<u>Federal Cases:</u>

*Camico Mutual Ins. Co. v. Rogozinski,* 3:10-CV-762-J-32MCR,
    2012 WL 4052090 (M.D. Fla. 9/13/12), *aff'd,* 530 Fed. Appx. 910,
    2013 WL 5303238 (11th Cir. 2013) ...................................................... 21, 28

*City of Oklahoma City v. Tuttle,*
    471 U.S. 808 (1985) ...................................................................................31

*City of St. Louis v. Praprotnik,*
    485 U.S. 112 (1988) .................................................................... 30, 32, 34

*Crowley v. Prince George's County,*
    890 F.2d 683 (4th Cir. 1989) ....................................................... 31, 32, 33

*Gregory v. Home Ins.,*
    876 F.2d 602 (7th Cir. 1989) ....................................................... 20, 21, 28

*Del Zotto v. Universal Physical Services, LLC,*
    214 F. Supp. 3d 499 (D.S.C. 2016) ...........................................................40

*Dotson v. Pfizer,*
    558 F.3d 284 (4th Cir. 2009) .....................................................................39

*Duke v. Uniroyal, Inc.,*
    928 F.2d 1413 (4th Cir. 1991) ..................................................................40

*Edwards v. City of Concord,*
    827 F. Supp. 2d 517 (M.D.N.C. 2011) ............................................... 37, 38

*Greensboro Prof. Fire Fighters Ass'n v. City of Greensboro,*
    64 F.3d 962 (4th Cir. 1995) .................................................... 31, 32, 33, 35

*Highwoods Prop., Inc. v. Exec. Risk Indem., Inc.,*
    407 F.3d 917 (8th Cir. 2005) .............................................................. 19, 21

*Hunter v. Town of Mocksville*,
  237 F. Supp. 3d 349, 2017 WL 680434 (M.D.N.C. 2017)................... *passim*

*Iglesias v. Wolford*,
  667 F. Supp. 2d 573 (E.D.N.C. 2009) ........................................................35

*Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely Law Corp.*,
  162 F. Supp. 3d 1068 (C.D. Cal. 2016)........................................................22

*Love-Lane v. Martin*,
  355 F.3d 766 (2004) ...................................................................................36

*McAfee v. Boczar*,
  738 F.3d 81 (4th Cir. 2013) ........................................................................40

*Monell v. New York Dep't of Soc. Servs.*,
  436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) ....................... 31, 34

*Morden v. XL Specialty Ins.*,
  177 F. Supp. 3d 1320, 2016 WL 1337252 (D. Utah 2016)............. 26, 27, 28

*Ogden v. Wax Works, Inc.*,
  29 F. Supp. 2d 1003 (N.D. Iowa 1998) ......................................................41

*Pembaur v. Cincinnati*,
  475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986) ...................... 31, 33

*Riddick v. School Bd. of Portsmouth*,
  238 F.3d 518 (4th Cir. 2000) ......................................................................33

*Semple v. City of Moundsville*,
  195 F.3d 708 (4th Cir. 1999) ......................................................................32

*Spell v. McDaniel*,
  824 F.2d 1380 (4th Cir. 1987) ....................................................................31

*United States v. Hedgepeth*,
  418 F.3d 411 (4th Cir. 2005) ......................................................................40

iv

**State Cases:**

*Allstate Ins. Co. v. Shelby Mut. Ins. Co.*,
    269 N.C. 341, 152 S.E.2d 436 (1967) .........................................................18

*Alt v. Parker*,
    112 N.C. App. 307, 435 S.E.2d 773 (1993) .................................................36

*Barr v. Colo. Ins. Guar. Ass'n & W. Guar. Fund Servs.*,
    926 P.2d 102 (Colo. Ct. App. 1995).............................................................22

*Beaufort County School District v. United Nat. Ins. Co.*,
    392 S.C. 506, 709 S.E.2d 85, 2011 WL 692226
    (S.C. Ct. App. 2011) ............................................................ 24, 25

*City of Greenville v. Haywood*,
    130 N.C. App. 271, 502 S.E.2d 430 (1998) .................................................18

*Clayton v. Branson*,
    153 N.C. App. 488, 570 S.E.2d 253 (2002) .................................................29

*Corum v. University of North Carolina*,
    330 N.C. 761, 413 S.E.2d 276 (1992) ............................................ 36, 37, 38

*Craig v. New Hanover County Bd. of Educ.*,
    363 N.C. 334, 678 S.E.2d 351 (2009) .................................................. 37, 38

*Debaun v. Kuszaj*,
    238 N.C. App. 36, 767 S.E.2d 353 (2014) ...................................................38

*Durham City Bd. of Educ. v. Nat'l Union Fire Ins. Co.*,
    109 N.C. App. 152, 426 S.E.2d 451 (1993) .................................................18

*Estate of Earley v. Haywood County Dep't of Social Services*,
    694 S.E.2d 405 (N.C. App. 2010) ...............................................................29

*Graham v. James F. Jackson Assoc., Inc.*,
    84 N.C. App. 427, 352 S.E.2d 878 (1987) ...................................................18

*Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield L.L.C.*,
    364 N.C. 1, 692 S.E.2d 605 (2010) ...................................................... 17, 19

*Herring v. Winston- Salem/Forsyth County Bd. of Educ.*,
    137 N.C. App. 680, 529 S.E.2d 458 (2000) .................................................28

*Johnson v. Causey*,
    701 S.E.2d 404, 2010 WL 4288511 (N.C. App. Nov. 2, 2010) ...................37

*Ledford v. Nationwide Mut. Ins. Co.*,
    118 N.C. App. 44, 453 S.E.2d 866 (1995) ...................................................28

*Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*,
    311 Conn. 29, 84 A.3d 1167, 2014 WL 223664 (2014).................. 20, 25, 26

*Maddox v. Colonial Life & Accident Ins. Co.*,
    303 N.C. 648, 280 S.E.2d 907 (1981) .........................................................18

*Matthews v. State Farm Fire & Cas. Co.*,
    122 N.C. App. 614, 471 S.E.2d 124 (1996) .................................................19

*McLeod v. Nationwide Mut. Ins. Co.*,
    115 N.C. App. 283, 444 S.E.2d 487 (1994) .................................................19

*Owen v. Haywood County*,
    697 S.E.2d 357 (N.C. App. 2010) ................................................................29

*Patrick v. Wake County Dep't of Human Services*,
    188 N.C. App. 592, 655 S.E.2d 920 (2008) .................................................29

*Phillips v. Gray*,
    163 N.C. App. 52, 592 S.E.2d 229 (2004) ...................................................36

*Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*,
    276 N.C. 348, 172 S.E.2d 518 (1970) ....................................... 18, 19, 21, 28

*Wilhelm v. City of Fayetteville*,
    121 N.C. App. 87, 464 S.E.2d 299 (1995) ....................................................29

*Woods v. Nationwide Mut. Ins. Co.*,
    295 N.C. 500, 246 S.E.2d 773 (1978) .........................................................19

## **Statutes:**

42 U.S.C. § 1983 .................................................................................................31

N.C. Gen. Stat. § 160A-148 ................................................................................35

N.C. Gen. Stat. § 160A-l64 .................................................................. 1, 12, 30, 35

N.C. Gen. Stat. § 160A-485(a) ............................................................................29

N.C. Gen. Stat. § 160A-485(c) ............................................................................29

## STATEMENT OF IRFFNC'S COVERAGE ISSUE FOR REVIEW

The coverage issue is whether Judge Schroeder's 2/21/17 Order (JA 2821-2839) and 3/3/17 Judgment (JA 2851-2856) correctly concluded that the claims by Officers-Plaintiffs-Appellants ("the Officers") are subject to a $1,000,000 limit of coverage under the Employment Practices Liability ("EPL") Coverage Form issued by the Interlocal Risk Financing Fund of North Carolina ("IRFFNC"), the municipal risk pool trust for the Town. (JA 2683, 2704-2714) IRFFNC and the Town agree that the Court properly concluded that the Officers' claims are "based on and arising out of the same act or interrelated acts of one or more insureds" and "shall be considered to be a 'single claim,' " subject to IRFFNC's $1,000,000 single claim limit.  (JA 2678-2682, 2683, 2704-2714, 2716-2719, 2821-2839)

## STATEMENT OF THE TOWN'S ISSUES FOR REVIEW

1.     Whether the district court correctly ruled the applicable insurance policy limit is $1,000,000.

2.     Whether the district court correctly ruled the Mocksville Town Board of Commissioners ("Town Board") had final policymaking authority over personnel rules where such authority is expressly granted to the Town Board in N.C.G.S. § 160A-164.

3.     Whether the district court correctly dismissed the Officers' independent claim under the North Carolina State Constitution where an adequate state remedy existed and the Officers successfully entered the courthouse doors, presented their claims for wrongful discharge, and obtained relief.

4.     Whether the district court acted within its discretion in awarding Officer Medlin front pay in lieu of reinstatement where the evidence indicated reinstatement was infeasible.

1

## STATEMENT OF THE CASE RELEVANT TO THE COVERAGE ISSUE

The trial evidence demonstrated that on December 14, 2011, the Officers called Governor Beverly Purdue's office and reported alleged corruption in the Mocksville Police Department. Approximately two weeks later on December 29, 2011, all three Officers were summarily terminated on the same day. (JA 2381, 2415, 2420) The Officers persuaded the jury that all three Officers were wrongfully terminated by the Town. (JA 2502, 2504, 2506) The Verdict Forms for all three Officers on their State Law Wrongful Termination claims against the Town submitted the identical jury issue:

> Were the Plaintiffs' communications to the governor's office regarding matters of public concern in the Mocksville Police Department a substantial factor in the named Defendant's decision to terminate [Hunter's] [Donathan's] [Medlin's] employment?

> Answer:  Town of Mocksville    yes

(JA 2502, 2504, 2506)

The duty owed to all three Officers under employment at-will was the same, causing identical harm to all three Officers by wrongful termination. The only difference among the claims was the calculation of damages recovered, based on the Officers' employment history with the Town, but not because of any different duty owed or any different wrongful acts committed by the Town. (JA 2503, 2505, 2507)

2

As shown by the Verdict Form submitting the identical jury issue for all three Officers on the State Law Wrongful Termination claims against the Town (JA 2502, 2504, 2506), the Officers obtained a Judgment (JA 2851-2856) for claims "based on and arising out of the same act or interrelated acts of one or more insureds," which "shall be considered to be a single 'claim,' " subject to IRFFNC's $1,000,000 Each Claim Limit. (JA 2678-2682, 2683, 2704-2714, 2716-2719, 2821-2839, 2851-2856)

### Statement of Key Facts Relevant to Coverage Issue

Judge Schroeder's February 21, 2017 Order summarized certain trial evidence important to the Court's decision to apply the $1,000,000 single claim limit to the Officers' claims, which were "based on and arising out of the same act or interrelated acts of one or more insureds." (JA 2708, 2710, 2821-2839) Judge Schroeder determined:

> Given the jury's verdict, the jury necessarily found that the reason Bralley and Cook terminated all three Plaintiffs was because Bralley and Cook learned that Plaintiffs had jointly participated in a call to the Governor's office on December 14, 2011, to complain about the MPD, which these Defendants viewed as an act of insubordination, as alleged in the complaint. (Doc. 1 at 18.) The trial evidence supported this conclusion. On the day before Plaintiffs were fired, Bralley and Cook met with the Town's attorney to discuss the prospect of firing Plaintiffs and to review the letters of terminations. All three Plaintiffs were fired on the same day within hours of each other. Prior to that, Cook had never terminated anyone before for the reasons Cook, Bralley, and the Town asserted as a defense. Donathan had been told shortly before that he had to "fall in line" with Cook's leadership and the "politics" of the MPD. On the day of the terminations, Cook posted a note in the MPD that "it was a tough but clear decision to make" and "[a]ny further rumors will be dealt with swiftly." Cook had described

3

> his opinion that "it was the purpose of these gentlemen [Plaintiffs] to
> degrade the department." Cook also told the local District Attorney,
> "You can't have three people in house undercutting you and causing
> trouble." In light of the verdict, the only conclusion that can be drawn
> from the evidence is that the jury determined that Plaintiffs'
> terminations were "based on and aros[e] out of the same act" by the
> Town; namely, the Town's approval of Plaintiffs' joint terminations
> upon the urging of Bralley and Cook, who viewed their call to the
> Governor as insubordinate.

(JA 2830-2831), *Hunter v. Town of Mocksville*, 237 F. Supp. 3d 349, 362-63, 2017

WL 680434 (M.D.N.C. 2017).

Trial testimony showed that prior to all three Officers' termination on the

same day on December 29, 2011, Police Chief Robert Cook ("Cook") had a meeting

with Town Manager Christine Bralley ("Bralley") to discuss reasons why Cook

wanted to terminate all three Officers, which Bralley explained to the jury. (JA 2099-

2104, 2108) Cook and Bralley had a 30-minute meeting in which they talked about

the grounds for termination of all three Officers. (JA 2126) Cook told Bralley during

the meeting that he planned to terminate all three Officers, and he gave her all three

names. (JA 1837-1838) Cook told Bralley that he felt that for the best of the police

department, all three Officers needed to be dismissed. (JA 2100)

Bralley approved Cook's firing of all three Officers, based on what Cook told

her about all three Officers. (JA 1838) Bralley told Cook that they would need to

get with the Town Attorney, which was a normal practice, to make sure they were

doing everything they were supposed to do in the right manner. (JA 2100) Bralley

4

talked with Town Attorney Hank Van Hoy ("Van Hoy") on the phone about terminating all three Officers. (JA 2101)

On December 28, 2011, the day before the Officers were terminated on December 29, 2011, Bralley and Cook met with Van Hoy to talk about termination of all three Officers. (JA 2112) When Bralley and Cook met with Van Hoy, they explained why they were planning to terminate all three Officers. (JA 2102) Van Hoy advised Bralley and Cook that as an employer at-will, they did not have to give a reason to terminate the three Officers. (JA 2102) Van Hoy provided Bralley and Cook with language to use in the termination letters to all three Officers. (JA 2102)

Once Bralley and Cook met with Van Hoy, it was Bralley's understanding that Cook was going forward with the termination of all three Officers. (JA 2103)

Cook made the decision to fire all three Officers. (JA 1794) After Cook decided to terminate all three Officers, he decided to do it on the same day. (JA 1828) Cook made the decision to terminate all three Officers "on or about" December 29, 2011, but the decision "might have been like the day before." (JA 1829) On the day the Officers were fired, Cook told his assistant he was going to fire all three Officers. (JA 1794)

Bralley contacted the Town Mayor and Commissioners to make them aware that termination of all three Officers would be taking place. (JA 2103)

Cook prepared termination letters dated December 29, 2011 to all three Officers. (JA 231, 233, 235, 1788, 2103, 2381, 2415, 2420) On December 29, 2011, all three Officers were given Termination Notices dated December 29, 2011. *Id.* All three Notices stated in part:  *Id.*

> Your employment is terminated as of December 29, 2011. The basis for the termination is that you are an employee at will and you are terminated upon the will of the Employer.

After all three Officers were terminated on December 29, 2011, Bralley received an email from Cook advising that all three Officers were terminated. (JA 2103-2104)

On December 29, 2011, the same day that all three Officers were terminated, Cook posted a Police Department Memo (JA 2419) stating in part:

> It is not with joy that I let each of you know that Hunter, Medlin and Donathan no longer are employed here. We will continue to grow and maintain a great dept. I cannot discuss personal problems with you but ***it was a tough but clear decision to make*** I will not allow our dept to be less than our best.
> . . .
> Any further rumors will be dealt with swiftly.
> . . .                                                              Chief Cook

(JA 2419) (emphasis added).

In Cook's opinion, "it was the purpose of these gentlemen to degrade the department." (JA 471, 1832) When Cook called the District Attorney to tell him that the three Officers had been terminated, the D.A. recalled that Cook said, "You just can't have people constantly undercutting you and causing problems." (JA 1764)

The jury rejected defense evidence that the Officers were terminated for different valid reasons, and instead concluded that all three Officers were wrongfully terminated by the Town. (JA 2502, 2504, 2506) The jury affirmatively answered the identical jury question submitted by all three Officers, specifically "Were the Plaintiffs' communications to the governor's office regarding matters of public concern in the Mocksville Police Department a substantial factor in the named Defendant's decision to terminate" the Officers' employment.  (JA 2502, 2504, 2506)

## THE TOWN'S STATEMENT OF THE CASE

### The Police Handbook Was Not Official Town Policy

The Officers argue that a police handbook is an official town policy. Plaintiffs' Opening Brief, p 37 (". . . defendant Cook . . . issued policies for the MPD governing the actions of its police officers."); Plaintiffs' Opening Brief, fn 4 ("Cook initially adopted the policies, which had been established years before, on a 'temporary' basis, but these policies remained in effect at the time of the plaintiffs' terminations.")  The record shows this is not true.

The police manual was never formally adopted by the Town and was only meant to be used as a guide.  (JA 2159) ("This policy was implemented to be used as a guide. It was never adopted by the Town of Mocksville mayor or commissioners, and it was never approved or adopted by myself or any other town

manager. It was just for a guide.") (JA 859) (commenting that the cover of the police manual does not state that the manual was approved by the manager or that it was a policy of the Town. Bralley stated that the police manual was a "tool" to be used.)

Chief Cook did not rely on the police manual in deciding to terminate the Officers. When asked if he had looked at the police manual before terminating the Officers, Cook replied, "No sir. I've looked at it over the years." (JA 1852-1853). When Cook was asked during his deposition to find each policy reason for termination in the police manual, Cook replied, "I don't know if it's in the policy." (JA 1853-1854; JA 640). As to whether it was in the police manual, Cook replied, "I wouldn't know where to find it in this policy. It would take me a day to read it and put my finger on it." (JA 1853-1854; JA 641).

The record shows that the police manual was not a source of official Town policy concerning termination of the Officers' employment. The record shows that Bralley and Cook barely had a passing knowledge of the police manual's contents. (JA 2154). Bralley had only looked at the police manual "briefly." (Bralley Trial Testimony, JA 2154) Cook admitted that he had only read "parts" of the police manual, not "word for word." (JA 1851). When asked during his deposition if he used the police manual, Cook replied "On occasion; not very often," and he had only revised it "one time." (JA 621-622).

8

### The Officers Were Not Precluded from Communicating with the
### Town Board of Commissioners or Town Manager

The Officers' brief cites to a passage in the police manual stating that officers were prohibited from contacting any member of the Town Board of Commissioners, Mayor, Town Manager, or others in authority except through regular channels or by permission of the Chief. (Plaintiffs' Opening Brief, p 38, citing the police manual, JA 266). However, the evidence showed this was not true, to the contrary, the existence of such a passage in the police manual demonstrates it was largely ignored by both Bralley and Cook. Town Attorney Hank Van Hoy stated in his affidavit that, "Town Manager Bralley . . . communicates to employees that they may meet with her or members of the Town Board to discuss any aspects of their employment which they may question, including but not limited to discharge from employment." (JA 113). Bralley stated in her affidavit that, "It is my normal practice to consult with Town Attorney Hank Van Hoy prior to the discharge of any employee of the Town." (JA 105). See also JA 101-102 ("Since I have been the Manager, I have an open door policy with regard to employee complaints."), and Bralley Trial Testimony (JA 2050) (Bralley testified ". . . I speak to employees annually, but it's a known fact that if there is any concern, that those employees can address that concern with me.")

The Officers argue that "Donathan sought out a town council member to appeal to after his discharge, he was sent back to Bralley," (Plaintiffs' Opening Brief, p 40, fn 5), while citing from Donathan's affidavit, "Following my termination I

went to go speak with Buster Cleary, a town board member. Mr. Cleary . . . was the Police Commissioner.  However, he told me he had no idea what was going on and instructed me that I should talk to town manager Christine Bralley."  (JA 162).  The Officers imply that Donathan went to Commissioner Cleary only to have the Commisioner rebuff him, sending him to Town Manager Bralley. In fact, Donathan's trial testimony clearly showed it was Donathan's idea, not Cleary's, to talk to Bralley. Donathan testified:

> "I arrived at Buster Cleary's office and walked in.  I had my termination letter with me.  I had done a lot of business with Buster.  Buster and I had a great relationship.  I sat down and I said, 'Buster,' I said, 'can you tell me why I have been terminated?'  Mr. Cleary leaned back in his chair, and he said, "I have absolutely no idea what you are talking about.'  He said, "What are you talking about?"  "I just got terminated."  He said, "For what?"  And I said, "I don't know.  That's what I'm trying to find out, but nobody will tell me why I've been terminated."  I said, "Can I talk to Christine Bralley about this?" He said, "Absolutely you can."  He made a phone call to Ms. Bralley, and when he got off the phone, he said, "You can go up there, and you can talk to Ms. Bralley."  So I did."

(JA 1973-1974)

Upon Donathan's arrival at Bralley's office, Donathan stated that he wanted to call a meeting with the Town Board of Commissioners, and was told by Bralley that the mayor or one of the commissioners would have to call a special-meeting. (JA 948-949).  Nothing in the record discloses that the Town Board of Commissioners could not consider Donathan's termination and in fact Bralley expressly informed Donathan that she could not call such a meeting herself.  (JA 712-713).

The record is replete with instances of police officers either approaching Town commissioners, or their complaints being forwarded to the Town Commissioners, or otherwise.    In response to Officer Medlin's complaint regarding Cook's allegedly buying beer on duty, Bralley brought the matter to the attention of the Mayor and two members of the Town Board of Commissioners, including Buster Cleary. (JA 956-958). When Bralley would not assist Donathan regarding his sign business to "be more of an advocate for small business," Donathan went to Commissioner Buster Cleary regarding that issue. (JA 863). One of the Officers complained to Commissioner Cleary regarding Cook's alleged absenteeism from work. (JA 899-900).

Even Bralley informed the Officers that she would bring their complaints against Cook to an outside investigator, the North Carolina State Bureau of Investigation, to review their allegations.  (JA 983, 989). The Officers declined Bralley's offer.  (JA 983).

## SUMMARY OF IRFFNC'S COVERAGE ARGUMENT

Judge Schroeder properly concluded in his 2/21/17 Order (JA 2821-2839) that the Officers' claims are limited to a total of $1,000,000 in coverage under IRFFNC's EPL policy issued to the Town because the Officers' claims are "based on and arising out of the same act or interrelated acts of one or more insureds," which under the unambiguous policy language "shall be considered to be a single

'claim,' " subject to the Each Claim Limit of a total of $1,000,000 in coverage.  (JA 2708, 2710; 2678-2682, 2683, 2704-2714, 2716-2719, 2821-2839, 2851-2856)

The policy clearly provides that the $1,000,000 Each Claim Limit in the Declarations and the policy's stated rules, fix $1,000,000 as the most that IRFFNC will pay for claims "based on and arising out of the same act or interrelated acts of one or more insureds," *"regardless of the number of"* "claims" made, or "suits" brought, or *"persons" making "claims" or bringing "suits."* (JA 2683, 2708, 2710)

## THE TOWN'S SUMMARY OF THE ARGUMENT

The district court properly concluded that the Town has only waived its governmental immunity to the extent of the insurance coverage provided to the Town by the applicable IRFFNC insurance policy.  Since the Town does not have insurance for any portion of any judgment exceeding the coverage, the Officers are barred from recovering from the Town anything in excess of the applicable insurance coverage.

The district court properly dismissed the Officers' First Amendment claim against the Town because there is no evidence of any official Town policy which violated their rights. In North Carolina, N.C.G.S. § 160A-164 grants the exclusive authority to set personnel policy with the Town Board.  The Officers' claims are based on Cook's and Bralley's decision to terminate their employment. The Town, not Cook nor Bralley had final policymaking authority.

12

The district court correctly dismissed the Officers' state constitutional claims because under well-established precedent, no direct claim under the North Carolina Constitution exists where, as here, the Officers had an adequate state remedy, such as their wrongful discharge claim, among others.

Finally, the district court did not abuse its discretion when it awarded Medlin front pay in lieu of reinstatement because reinstatement was not feasible.

### IRFFNC's ARGUMENT

**I.** **The Officers' Claims Are Based On and Arising Out of the Same Act or Interrelated Acts of One or More Insureds and Shall Be Considered A Single Claim Under IRFFNC's Policy, Subject to a $1,000,000 Limit**

#### A. Scope of Coverage Provided by IRFFNC to the Town

IRFFNC's Employment Practices Liability ("EPL") Coverage Form issued to the Town for 7/1/11 - 7/1/12 is a "claims made" policy which applies to covered claims made during that period. (JA 2683, 2704) The policy agrees to pay sums that the Town becomes legally obligated to pay as damages resulting from "claims" against the Town to which coverage applies by reason of "employment wrongful acts," as defined to include "termination of employment." (JA 2704, 2713)

IRFFNC provides a total of $1,000,000 in coverage for all of the Officers' claims combined, based on policy language requiring that, " *'Claims' based on and arising out of the same act or interrelated acts of one or more insureds shall*

13

*be considered to be a single 'claim,'* " subject to the $1,000,000 Each Claim Limit on the Declarations Page, *"regardless of the number of"* "claims" made, or "suits" brought, or *"persons" making "claims" or bringing "suits."* (JA 2683, 2708, 2710)

IRFFNC's key policy language clearly and unambiguously provides:

## SECTION I - EMPLOYMENT PRACTICES LIABILITY COVERAGE

1. Insuring Agreement.

  a. We will pay those sums that the insured becomes legally obligated to pay as damages resulting from "claims", to which this insurance applies, against the insured by reason of "employment wrongful act(s)". No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS. . . .

   (1) *The amount we will pay for damages is limited as described in SECTION III - LIMITS OF INSURANCE*; and

   (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements.

  b. This insurance applies only if a "claim" for damages because of the "employment wrongful act(s)" is first made against any insured during the policy period. . . .

   (3) All "claims" based on or arising out of the same or related "employment wrongful act(s)" or offenses by one or more insureds shall be considered first made when the first of such "claims" is made. **_Related "employment wrongful act(s)" means two or more wrongful acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of related facts,_**

14

> ***circumstances, situations, events, transactions,
> or causes.***

(JA 2704)(emphasis added)

The EPL Declarations Page (JA 2683) provides the following Limits and Deductible:

| | |
|---|---|
| **Each Claim Limit** | **$1,000,000** |
| Annual Aggregate Limit for all Claims | $3,000,000 |
| **Deductible (Each Claim)** | **$5,000** |

Only one $5,000 deductible applied to the Officers' combined claims. (JA 2719)

The EPL Form unambiguously states, "The amount we will pay for damages is limited as described in SECTION III - LIMITS OF INSURANCE." (JA 2704)

Section III clearly sets forth the rules which apply to the Limits of Insurance:

**SECTION III - LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay ***regardless of the number of***:

   a.  ***Insureds***;
   b.  ***"Claims" made*** or "suits" brought; or
   c.  ***Persons*** or organizations ***making "claims" or bringing "suits".***

2. The Annual Aggregate Limit is the most we will pay for all damages.

3. Subject to 2. above, the Each Claim Limit is the most we will pay for all loss arising out of any "employment wrongful act(s)"

15

covered by this policy. ***"Claims" based on and arising out of the***
***same act or interrelated acts of one or more insureds shall be***
***considered to be a single "claim".***

(JA 2708)(emphasis added)

Section VI defines a "claim" to include "filing and or service of suit papers:"

## SECTION VI – DEFINITIONS

. . .

5.    ***"Claim" means a demand received by the insured for money***
***damages,*** non monetary damages as provided in the
SUPPLEMENTARY PAYMENTS, ***filing and or service of suit***
***papers*** or arbitration proceedings ***filed against the insured arising***
***out of "employment wrongful act(s)" to which this insurance***
***applies.***

(JA 2703)(emphasis added)

Section IV clearly explains the deductible and reiterates that, *"Claims" based on*

*or arising out of the same act or interrelated acts of one or more insureds shall be*

*considered a single "claim"* (JA 2710), as clearly stated:

## SECTION IV – EMPLOYMENT PRACTICES LIABILITY CONDITIONS

. . .

8.    **Deductible**

a.    Our obligation under Section I of this policy to pay damages
on behalf of the insured applies only to the amount of
damages in excess of any deductible amount stated in the
Declarations.

b.    The deductible amount stated in the Declarations, if any,
applies to all damages sustained by any person or
organization as the result of any one "claim". ***"Claims"***

16

> ***based on or arising out of the same act or interrelated acts of one or more insureds shall be considered a single "claim". . .***

(JA 2710)(emphasis added)

The policy unambiguously states that IRFFNC "will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance." (JA 2709)

### B.    IRFFNC's $1,000,000 Limit Applies to Officers' Claims and Judgment

Based on the facts, IRFFNC provides a total of $1,000,000 in coverage for the Officers' claims, based on clear policy language requiring that, " '*Claims' based on and arising out of the same act or interrelated acts of one or more insureds shall be considered to be a single 'claim,'* " subject to the $1,000,000 Each Claim Limit on the Declarations Page, *"regardless of the number of"* "claims" made, or "suits" brought, *or "persons" making "claims" or bringing "suits."* (JA 2683, 2708, 2710)

From a coverage standpoint, it is irrelevant that the defense tried to argue that the Officers were terminated for valid different reasons because the jury rejected the defense. IRFFNC's duty to indemnify is based on facts determined at the trial on which the Judgment was rendered. *Harleysville Mut. Ins. Co. v. Hartford Cas. Ins. Co.*, 90 F. Supp. 3d 526, 554, 2015 WL 859586 (E.D.N.C. 2015), *appeal dism.* (9/30/15)(insurer's duty to indemnify is based on facts determined at trial).

Trial evidence showed that the Officers' claims were "*based on and arising out of the same act or interrelated acts of one or more insureds,*" including but not limited to the evidence cited above. (JA 97, 104, 113, 231, 233, 235, 720, 725, 1788, 1794, 1828-29, 1837-38, 2099-2104, 2108, 2112, 2126, 2381, 2415, 2419, 2420)

Under the policy language as applied to the Judgment, the Town has no coverage below the $5,000 deductible or above the $1,000,000 Limit. (JA 2719)

## C.   <u>General Rules of Insurance Policy Construction</u>

The general rules of insurance policy construction are correctly summarized in Judge Schroeder's February 21, 2017 Order at JA 2821-2823:

> The interpretation of an insurance policy presents a question of law, and the parties accept that the Fund's policy must be interpreted under the law of the State of North Carolina. Under North Carolina law, "an insurance policy is a contract between the parties which must be construed and enforced according to its terms." *Graham v. James F. Jackson Assoc., Inc.*, 84 N.C.App. 427, 430, 352 S.E.2d 878, 880 (1987) (citing *Allstate Ins. Co. v. Shelby Mut. Ins. Co.,* 269 N.C. 341, 152 S.E.2d 436 (1967)). The court is obliged to use the definitions supplied in the policy to determine the meaning of words contained in it. *Durham City Bd. of Educ. v. Nat'l Union Fire Ins. Co.*, 109 N.C.App. 152, 156, 426 S.E.2d 451, 453 (1993) (quoting *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970)). "In the absence of such definition [s], nontechnical words are to be given a meaning consistent with the sense in which they are used in ordinary speech ...." *Id.* (quoting *Wachovia Bank & Trust Co.*, 276 N.C. at 354, 172 S.E.2d at 522) (alterations in original).
>
> Any ambiguity in a policy must be strictly construed in favor of providing coverage to the insured. *City of Greenville v. Haywood*, 130 N.C. App. 271, 275, 502 S.E.2d 430, 433 (1998); *Maddox v. Colonial Life & Accident Ins. Co.*, 303 N.C. 648, 650, 280 S.E.2d 907, 908 (1981). In other words, when confronting ambiguity, courts should

interpret the policy as having greater coverage. *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield L.L.C.*, 364 N.C. 1, 9–10, 692 S.E.2d 605, 612 (2010) (policy provisions that extend coverage must be liberally construed in order to provide coverage wherever possible by reasonable construction). "An ambiguity exists when the language used in the policy is susceptible to different, and perhaps conflicting, interpretations." *McLeod v. Nationwide Mut. Ins. Co.*, 115 N.C. App. 283, 290, 444 S.E.2d 487, 492 (1994). The court cannot assume the existence of an ambiguity, however, "simply because a plaintiff makes a claim based on a construction of the insurance policy's language contrary to that of the company's interpretation." *Christ Lutheran Church by & Through Matthews v. State Farm Fire & Cas. Co.*, 122 N.C. App. 614, 471 S.E.2d 124, 125 (1996).

*If the policy is not ambiguous, "the court must enforce the contract as the parties have made it and may not, under the guise of interpreting an [allegedly] ambiguous provision, remake the contract and impose liability upon the insurance company which it did not assume and for which the policyholder did not pay." Wachovia Bank & Trust Co.*, 276 N.C. at 354, 172 S.E.2d at 522.

*Hunter v. Town of Mocksville,* 237 F. Supp. 3d 349, at 359 (emphasis added).

As also correctly summarized in Judge Schroeder's February 21, 2017 Order

at JA 2827-2828:

All provisions of an insurance policy must be read together so as to give each provision meaning. *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978); *Wachovia Bank & Trust Co.*, 276 N.C. at 355, 172 S.E.2d at 522. The policy should also be construed in the context of the facts of the particular case, and not simply in the abstract. *Highwoods Prop., Inc. v. Exec. Risk Indem., Inc.*, 407 F.3d 917, 923 (8th Cir. 2005) (applying North Carolina law, noting that "the same language may be found both ambiguous and unambiguous as applied to different facts"); *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 42, 84 A.3d 1167, 1175 (2014). *Here, the unambiguous language of Section III, read as a whole, provides that all Plaintiffs' claims based on and arising out of the insured's interrelated wrongful employment acts are subject to the $1,000,000 Each Claim*

*Limit,* ***regardless of the number of persons bringing claims****.* To adopt Plaintiffs' construction—that the provisions of Section III limit only *each Plaintiff's* recovery for multiple claims, but no more—requires a strained reading of unambiguous terms and would read out of the policy the express reference to the limitation as to "persons."

*Hunter v. Mocksville,* 237 F. Supp. 3d at 361-62 (emphasis added).

### D. Legal Authority Supports Application of IRFFNC's $1,000,000 Limit

IRFFNC is not aware of any binding North Carolina authority addressing this coverage issue. However, application of the rules of construction employed by North Carolina courts demonstrates that Judge Schroeder correctly determined that the Officers' claims are subject to the $1,000,000 Each Claim Limit. Other jurisdictions addressing similar policy language have concluded that multiple claimants asserting claims arising out of related or interrelated acts are subject to the Each Claim Limit (a/k/a Single Claim Limit or Per Claim Limit), rather than the Aggregate Limit, even though the claims were asserted by multiple different claimants in the same lawsuit.

In *Gregory v. Home Ins.*, 876 F.2d 602, 604 (7th Cir. 1989), the Seventh Circuit affirmed the District Court's application of the $500,000 Each Claim Limit, rather than the $1,000,000 Aggregate Limit, to limit claims asserted by multiple claimants in the same lawsuit under policy language stating, "Two or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim." *Id*.

20

In *Camico Mutual Ins. Co. v. Rogozinski,* 3:10-CV-762-J-32MCR, 2012 WL 4052090, at 5 (M.D. Fla. 9/13/12), *aff'd,* 530 Fed. Appx. 910, 2013 WL 5303238 (11th Cir. 2013), the Middle District of Florida, affirmed by the Eleventh Circuit, applied the policy's $1,000,000 Per Claim Limit, rather than the $2,000,000 Aggregate Limit, to limit claims asserted by multiple claimants in the same lawsuit under policy language stating, "A single Per Claim Limit of Liability applies to a Claim arising from Multiple Acts, Errors or Omissions, regardless of the number of claimants, lawsuits, or Insureds involved.") *Id*.

The decisions in *Gregory* and *Camico* demonstrate that IRFFNC's policy language is clear and unambiguous and that provisions establishing the $1,000,000 Each Claim Limit should be enforced as the policy is written. *Id*. In North Carolina:

> "*... ambiguity in the terms of an insurance policy is not established by the mere fact that the plaintiff makes a claim based upon a construction of its language which the company asserts is not its meaning*. No ambiguity exists unless, in the opinion of the court, the policy language is fairly and reasonably susceptible to either of the constructions for which the parties contend. (citations omitted) If it is not, *the court must enforce the contract as the parties have made it, and may not under the guise of interpreting an allegedly 'ambiguous' provision, remake the contract and impose liability upon the insurance company which it did not assume and for which the policyholder did not pay*."

*Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970)(emphasis added).

*See also Highwoods Prop., Inc. v. Exec. Risk Indem., Inc.*, 407 F.3d 917, 923-24 (8th Cir. 2005)(applying North Carolina law and holding that a class action filed

after dismissal of a prior class action nevertheless constituted a "related" claim subject to the policy's "single claim" limit, even though it alleged different legal claims and "the two cases did not arise out of identical facts," but "were grounded in actions taken by the defendants in relation to the [same company's] acquisition");

*Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely Law Corp*., 162 F.Supp.3d 1068, 1078–79 (C.D. Cal. 2016) (finding that seven separate lawsuits against a law firm, each alleging false representations as to sales of properties, constituted a "single claim" under a policy provision stating, "Claims alleging, based upon, arising out of or attributable to the same or related wrongful acts shall be treated as a single claim regardless of whether made against one or more than one of you" because they were "related" and arose out of a "single course of conduct" reflecting a fraudulent scheme), *appeal docketed*, No. 16–55711 (9th Cir. 5/16/16);

*Barr v. Colo. Ins. Guar. Ass'n & W. Guar. Fund Servs.*, 926 P.2d 102, 104–05 (Colo. Ct. App. 1995) (finding that claims against officers and directors of cooperative of member grocery stores for damages relating to a failed loan asserted a single claim under policy providing, "Losses arising out of the same Wrongful Act by one or more of the Directors and/or Officers or interrelated Wrongful Acts by one or more of the Directors and/or Officers shall be considered a single Loss").

### E.     The Officers' Arguments Ignore IRFFNC's Plain Policy Language

The Officers' contention that the policy provides up to $1,000,000 in coverage

for each Plaintiff ignores the Section III language clearly and unambiguously stating:

## SECTION III - LIMITS OF INSURANCE

1. The ***Limits of Insurance shown in the Declarations*** and ***the rules below*** fix ***the most we will pay <u>regardless of the number of</u>***:
   a. ***Insureds***;
   b. ***"Claims" made*** or "suits" brought; or
   c. ***<u>Persons</u>*** or organizations ***<u>making "claims" or bringing "suits"</u>***.

2. The Annual Aggregate Limit is the most we will pay for all damages.

3. Subject to 2. above, the ***<u>Each Claim Limit</u>*** is ***the most we will pay*** for ***<u>all loss</u>*** arising out of ***any*** "employment wrongful act(s)" covered by this policy. ***<u>"Claims" based on and arising out of the same act or interrelated acts of one or more insureds shall be considered to be a single "claim"</u>***.

(JA 2708)(emphasis added)

The Officers' argument also ignores policy language clearly stating:

## SECTION IV – EMPLOYMENT PRACTICES LIABILITY CONDITIONS

**8.     Deductible**
   . . .

   b.     . . .***<u>"Claims" based on or arising out of the same act or interrelated acts of one or more insureds shall be considered a single "claim."</u>***

(JA 2710)(emphasis added)

23

When all policy provisions are read together to give each provision meaning, they reflect the clear intent that, *"regardless of the number of ... Persons ... making 'claims' or bringing 'suits,' "* all claims *"based on and arising out of the same or interrelated acts of one or more insureds"* shall be considered a single claim, subjecting "all loss" to the $1,000,000 Each Claim Limit. (JA 2683, 2708, 2710)

### F.    The Officers' Cases Are Factually and Procedurally Distinguishable

The Officers cite three out-of-state cases which are factually and procedurally distinguishable and inapplicable because they do not include policy language like IRFFNC's in Section III(1)(c) stating, "The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay *regardless of the number of . . . Persons . . . making 'claims' or bringing 'suits.'"* (JA 2708)(emphasis added)

First, the Officers cite *Beaufort County School District v. United Nat. Ins. Co.*, 392 S.C. 506, 709 S.E.2d 85, 2011 WL 692226 (SC Ct. App. 2011), which held that the South Carolina Beaufort County school district's settlement of allegations by seven students who were sexually molested by one teacher gave rise to seven claims, rather than one claim, under sexual abuse and sexual harassment endorsements to a CGL policy. *Beaufort County*, 392 S.C. 506, 517–18, 709 S.E.2d 85, 91 (SC Ct. App. 2011), is distinguishable because the policy refers to a sexual abuse victim *singularly* as "*a person*," using language not found in IRFFNC's policy.

24

In *Beaufort County*, it was critical to the Court's decision that the policy definition of "SEXUAL ABUSE means any actual, attempted or alleged criminal sexual conduct of *a person* by another person, or persons acting in concert ... which causes physical and/or mental injuries." 392 S.C. at 514, 709 S.E.2d at 89 (emphasis added). The policy language referred to the victim of sexual abuse *singularly* as "*a person*," using singular reference language which is not found in IRFFNC's policy, but which made the critical difference in the Court's coverage analysis. 392 S.C. at 517–18, 709 S.E.2d at 91 (emphasis added).

The Officers also rely on *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 32–67, 84 A.3d 1167, 1170–90, 2014 WL 223664 (2014), which is entirely distinguishable based on its facts and coverage issues involved. In *Lexington*, the Connecticut Supreme Court interpreted a professional liability insurance policy to determine coverage available for multiple residents of a nursing home who died or were injured when the facility was set on fire by another resident. After thirteen different negligence lawsuits were filed, Lexington Insurance filed a declaratory judgment action concerning the amount of liability insurance coverage available, naming its insured Lexington Healthcare as property lessee, the nursing home, the property owner and lessor, and the victims' personal representatives.

As to the coverage available for claims in the thirteen different negligence lawsuits, the trial court in *Lexington Insurance* found that under the policy's

$500,000 "per medical incident" limit for professional liability coverage, the acts, errors or omissions underlying each individual's injuries or death constituted separate medical incidents and were not "related" medical incidents because Lexington Healthcare owed separate duties to each individual, each was differently situated and had different medical service needs, and that during the fire and evacuation, Lexington Healthcare failed to take appropriate action as to each individual in very different and distinct ways. 84 A.3d at 1176. The Court explained:

> . . . Each individual defendant has raised *multiple allegations of negligence, in some cases upwards of twenty.* Although some allegations pertain to negligent supervision of the individual who started the fire, others aver a wide variety of different safety and response failures by Lexington Healthcare. *Because each individual defendant was differently situated in terms of his or her proximity to the fire and resultant smoke, access to an exit, and personal health and mobility issues, the particular array of negligent shortcomings that ultimately led to his or her injury or death necessarily varied.* Additionally, to the extent similar acts, errors or omissions appear across multiple complaints, *they nevertheless are alleged to have caused multiple, distinct losses to different individuals. Overall, the medical incidents underlying the individual defendants' claims are as dissimilar as they are alike.* . . .

*Lexington,* 84 A.3d at 1176-77 (emphasis added).

The Officers' reliance on *Morden v. XL Specialty Ins.*, 177 F. Supp. 3d 1320, 1331–37, 2016 WL 1337252 (D. Utah 2016) is also misplaced. In *Morden*, the Court considered whether a securities claim should be excluded from coverage because it related back to a prior SEC Claim, requiring the court to determine if the SEC Claim and the Morden individual investors' claim arose from "interrelated" wrongful acts

such that they should be considered a single claim deemed to have been made on the date of the SEC Claim. The policy in *Morden* defined interrelated wrongful acts as wrongful acts that "are based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related or series of related facts, circumstances, situations transactions or events." *Id.*, at 1331. The Court determined that, "By its plain terms, the definition of interrelated wrongful acts is broad. *But it is not ambiguous*." *Id.* (emphasis added). The Court explained:

> ". . . Rather than be capable of multiple meanings, *the Policy plainly and unmistakably communicates to an insured that wrongful acts are interrelated where they are logically or causally connected*."

*Morden,* 177 F. Supp. 3d at 1331 (emphasis added). The Court in *Morden* also stated:

> *". . . Because of its breadth, the interrelated wrongful acts provision does not require the wrongful acts alleged in the claims to be identical to be interrelated*."

*Morden,* 177 F. Supp. 3d at 1331 (emphasis added).

The Court in *Morden* noted that even if multiple claims allege interrelated wrongful acts, the claims must "*arise from*" the interrelated wrongful acts. *Id.* at 1332. Even though the policy did not define the phrase "arise from," the Court determined, "Nevertheless, the court finds the phrase is also *unambiguous*." *Id.* at 1332 (emphasis added).

*Morden* observed that courts considering this issue have recognized that for claims to arise from "interrelated" wrongful acts, they must share a "sufficient factual nexus." *Id*. at 1334-35. *Morden* focused on significant differences between

27

two claims in that case, concluding that "any factual nexus between the claims" was "marginal at best," *Id.,* at 1336-37, ultimately concluding that the SEC and Morden claims alleged both interrelated and unrelated wrongful acts. *Id.*

The decisions cited by IRFFNC are much closer on point than the Officers' cases, even if no courts have yet addressed IRFFNC's *exact same* policy language. (JA 2708, 2710)

### G. District Court Properly Applied $1,000,000 Limit to the Officers' Claims

Judge Schroeder correctly held that IRFFNC's coverage is limited to a total of $1,000,000 for the Officers' claims. (JA 2835) *Hunter v. Mocksville,* 237 F. Supp. 3d at 364-65; *Gregory; Camico, supra.*

Courts cannot expand coverage where none was bargained for between the insurer and the insured. *Wachovia Bank & Trust Co*., 276 N.C. at 354, 172 S.E.2d at 522; *Ledford v. Nationwide Mut. Ins. Co.,* 118 N.C. App. 44, 453 S.E.2d 866, 869 (1995)("the court must enforce the [insurance] policy as written and may not reconstruct [it] under the guise of interpreting an ambiguous provision").

### THE TOWN'S ARGUMENT

### I. THE TOWN WAIVED IMMUNITY ONLY TO THE EXTENT OF ITS INSURANCE COVERAGE

Governmental immunity is a common law theory or defense established by North Carolina courts to protect a sovereign or state and its agents from suit. *Herring*

*v. Winston- Salem/Forsyth County Bd. of Educ.,* 137 N.C. App. 680, 681, 529 S.E.2d 458, 460 (2000). Specifically, "[a] municipality and its agents are immune from liability for the torts of its officers and employees 'if the torts are committed while they are performing a governmental function.'" *Clayton v. Branson,* 153 N.C. App. 488, 493, 570 S.E.2d 253, 256-57 (2002). Pursuant to N.C. Gen. Stat. §160A-485(a), a municipality may waive immunity from tort liability through the purchase of liability insurance.

However, "[i]mmunity shall be waived only to the extent that the city is indemnified by the insurance contract from tort liability." *Id.* Further, no judgment may be entered against a city in excess of its insurance policy limits on any tort claim for which it would have been immune but for the purchase of liability insurance pursuant to this section. N.C. Gen. Stat. §160A-485(c). A municipality does not waive governmental immunity from tort actions up to the amount of any self-insured retention. *See Wilhelm v. City of Fayetteville,* 121 N.C. App. 87, 464 S.E.2d 299 (1995).

Moreover, a municipality does not waive governmental immunity if the action brought against it is excluded from coverage under its insurance policy. *See Owen v. Haywood County,* 697 S.E.2d 357 (N.C. App. 2010); *Estate of Earley v. Haywood County Dep't of Social Services,* 694 S.E.2d 405 (N.C. App. 2010); and *Patrick v. Wake County Dep't of Human Services,* 188 N.C. App. 592, 655 S.E.2d 920 (2008).

Defendant Town's municipal risk pool trust carrier, the Interlocal Risk Financing Fund of North Carolina ("IRFFNC") provides Employment Practices Liability ("EPL") coverage. Since the Town does not have liability insurance for any portion of any judgment exceeding the EPL coverage limit, its governmental immunity bars the Officers from recovering more than the limit amount.

## II. THE DISTRICT COURT CORRECTLY RULED THE MOCKSVILLE TOWN BOARD HAD FINAL POLICYMAKING AUTHORITY OVER PERSONNEL ISSUES PURSUANT TO THE EXPRESS LANGUAGE OF N.C.G.S. § 160A-164.

The practical effect of the Officers' and the amici's argument, if accepted by this Court, would be to impose *respondeat superior* liability on the Town for the acts of Cook and Bralley. This is directly contrary to settled law. In North Carolina, N.C.G.S. § 160A-164 grants the exclusive authority to set personnel policy with the Town Board. The Supreme Court has held that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988).

The evidence plainly shows the Town merely granted hiring and firing authority to the town manager and allowed other Town officials to run their departments. This does not transform every personnel *decision* into official Town *policy*, much less final policy. Plaintiffs' argument that everything Cook or Bralley did carried the full weight of final official Town policy simply cannot

30

stand. The district court correctly granted summary judgment and should be affirmed.

Municipal liability may be imposed under 42 U.S.C. § 1983 only where the constitutional deprivation is the direct result of the municipality's official policy or custom; a municipality cannot be held liable solely on the basis of *respondeat superior. Greensboro Prof. Fire Fighters Ass'n v. City of Greensboro,* 64 F.3d 962, 964 (4th Cir. 1995) (citing *Monell v. New York Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)); *Crowley v. Prince George's County,* 890 F.2d 683 (4th Cir. 1989). The employee must demonstrate that the alleged constitutional deprivation was caused by an official policy or custom of the municipality itself. *Crowley,* 890 F.2d at 685-87.

In this context, municipal "policy" refers to "formal rules or understandings… that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). "Policy" is found in ordinances and regulations, as well as in *ad hoc* policy decisions of officials with policymaking authority, and is generally understood to mean "'a course of action consciously chosen from among various alternatives' respecting basic government functions." *Spell v. McDaniel,* 824 F.2d 1380, 1385-86 (4th Cir. 1987) (quoting *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823 (1985)). This contrasts with "episodic

31

exercises of discretion in the operational details of government." *Semple v. City of Moundsville,* 195 F.3d 708, 712 (4th Cir. 1999).

In the context of a retaliatory discharge claim, the plaintiff is required to show that his termination was caused by an existing, unconstitutional policy of the municipality which disfavors municipal employees who exercise the same right. *Greensboro Fire Fighters,* 64 F.3d at 964-65. Here, the Officers' Section 1983 claim fails because the record is devoid of evidence that any policy or custom of the Town led to the deprivation of the Officers' constitutional rights. There is no evidence that the Officers' termination was caused by an existing, unconstitutional municipal policy of terminating officers for exercising their First Amendment rights.

An isolated personnel decision may support municipal liability, but only for acts "which the municipality has officially sanctioned or ordered." *Praprotnik,* 485 U.S. at 123. Further, "the authority to make municipal policy is necessarily the authority to make final policy." *Id*. Identification of the municipality's final policymaker must instead be made by reference to state or local law. *Id.*; also see *Crowley,* 890 F.2d at 685-86.

The Officers argue that Cook and Bralley had the authority to hire and fire and that the Town Board was not involved in these decisions. They argue that Bralley was the final decision maker with respect to their employment and that

Cook had authority to run the police department, therefore the Town of Mocksville is liable for their decisions. The Officers' argument fails as a matter of law.

Even if a police chief has been delegated the authority to make personnel decisions within a department, this does not vest the chief with policymaking authority for the municipality. *Crowley,* 890 F.2d at 686. "[T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy." *Pembaur,* 475 U.S. at 483, n. 12, 106 S. Ct. 1300, n. 12. As noted in *Crowley,* "To rule to the contrary would expose a municipality to potential liability for every personnel decision. *Crowley,* 890 F.2d at 687.

The *Crowley* court held that there is a distinction between the discretionary authority to make final *decisions* on a particular matter and the authority to make final municipal *policy* on that matter. *Crowley,* 890 F.2d at 685. More specifically, the *Crowley* panel held that the fact that a police chief had "final" discretion to hire and fire employees of his police department did *not* establish that he was a "final policymaker" with regard to municipal employment policy. *Crowley,* 890 F.2d at 685-87; *accord Greensboro Fire Fighters,* 64 F.3d at 966; *see also Riddick v. School Bd. of Portsmouth,* 238 F.3d 518, 522-24 (4th Cir. 2000) (holding that delegation of the authority to make discretionary personnel decisions is *not* the equivalent of delegating final policymaking authority).

Further, in *City of St. Louis v. Praprotnik, supra*, the Court stated, "If city employment policy was set by the Mayor and Alderman and the Civil Service Commission, only those bodies' decisions would provide a basis for city liability. This would be true even if the Mayor and Alderman and the Commission left the appointing authorities discretion to hire and fire employees and they exercised that discretion in an unconstitutional manner." *Praprotnik,* 485 U.S. at 129-30 (internal quotation marks omitted). The Court went on to say:

> It is not enough for the plaintiff to simply show that the final policymaker went along with the discretionary decision proposed by his subordinate, because that would effectively result in the imposition of liability under the doctrine of *respondent superior.* Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them… [T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale. In such circumstances, the purposes of 1983 would not be served by treating a subordinate employee's decision as if it were a reflection of municipal policy.

*Praprotnik,* 485 U.S. at 130-31.

The rationale of these cases is simple: To expose a municipality to liability under these circumstances would be to impose liability under *respondeat superior* principles—which is strictly prohibited under *Monell* and its progeny. "Municipal liability thus depends on whether the liability asserted is based on a municipal act

and not simply on the independent act of a municipal employee, even though that employee may be acting as the final decision maker. When a final decision by an employee implements municipal policy, then municipal liability may follow. But if a final decision does not implement municipal policy, or is contrary to it, then it is not imputable to the municipality." *Greensboro Fire Fighters,* 64 F.3d at 964-65.

There is no evidence in this case of an official Town policy to violate police officers' First Amendment rights. The Officers' claims are based on Cook's and Bralley's decision to terminate their employment. However, neither Cook nor Bralley had final policymaking authority on the Town's behalf.

"The court's identification of policymaking officials is a question of state law, not of fact… Under North Carolina law, the city council is vested with the authority to make personnel policies. *See* N.C. Gen. Stat.. § 160A-l64. Although the city council may… delegate the authority to implement individual personnel decisions, the ultimate authority to make personnel policy remains with the city council." *Iglesias v. Wolford,* 667 F. Supp. 2d 573, 589 (E.D.N.C. 2009). *Also see*, N.C. Gen. Stat.. § 160A-148, providing that the town manager shall appoint and suspend or remove municipal employees "in accordance with such general personnel rules, regulations, policies, or ordinances *as the council* may adopt." (emphasis supplied).

The district court correctly granted summary judgment because there is no evidence of an official policy or custom, nor that the Town Board was "aware of any

constitutional violation and either participated in or otherwise condoned it." *Love-Lane v. Martin,* 355 F.3d 766, 783 (2004). Accordingly, the district court's decision should be affirmed.

### III. WHERE THE OFFICERS SUCCESSFULLY AVAILED THEMSELVES OF AN ADEQUATE STATE REMEDY, THE DISTRICT COURT CORRECTLY DISMISSED THEIR CLAIMS UNDER THE NORTH CAROLINA CONSTITUTION.

The Officers advance the novel argument that an available state remedy cannot be "adequate" unless it delivers full recovery of every form of relief to which plaintiffs believe they are entitled. This is not the law. Under well-established precedent, no direct claim under the North Carolina Constitution exists where, as here, the Officers were able to enter the courthouse and present their claims. The district court correctly dismissed the Officers' state constitutional claims and its decision should be affirmed.

In *Corum* v. *University of North Carolina,* 330 N.C. 761, 782, 413 S.E.2d 276 (1992), the North Carolina Supreme Court held that an independent constitutional claim is only available "in the absence of an adequate state remedy." *See further, Alt* v. *Parker,* 112 N.C. App. 307, 435 S.E.2d 773 (1993) (inmate in a state mental institution did not make out a constitutional claim for violation of his liberty interest because he had an adequate remedy in the tort law of false imprisonment); *Phillips* v. *Gray,* 163 N.C. App. 52, 58, 592 S.E.2d 229, 233 (2004) ("As plaintiff's rights are adequately protected by a wrongful discharge claim, a direct constitutional claim

is not warranted."). An adequate state remedy exists when it provides "the possibility of relief under the circumstances." *Craig v. New Hanover County Bd. of Educ.,* 363 N.C. 334, 340, 678 S.E.2d 351, 355 (2009). An adequate remedy exists when a plaintiff has "the opportunity to enter the courthouse doors and present [her] claim." *Id.* at 339-40, 678 S.E.2d at 355.

The Court in *Corum* stated that the judiciary "must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of its inherent constitutional power" and "must minimize the encroachment upon other branches of government ... by seeking the least intrusive remedy available and necessary to right the wrong." 330 N. C. at 784, 413 S.E.2d at 291. *See also Edwards v. City of Concord,* 827 F.Supp 517 (M.D.N.C. 2011) (no state constitutional claim where claims of assault and battery and false arrest remain against police officer in his individual capacity); *Johnson v. Causey,* 701 S.E.2d 404, 2010 WL 4288511, at *10 (N.C. App. Nov. 2, 2010) (no state constitutional claim where claims of misconduct and negligent infliction of emotional distress remain against deputy sheriff in his individual capacity); and *Glenn-Robinson,* 140 N.C. App. at 632, 538 S.E.2d at 619 (no state constitutional claim where claims of assault and battery and false imprisonment remain against police officer in his individual capacity).

In *Craig v. New Hanover County Bd. of Educ,* the North Carolina Supreme Court narrowly held that a plaintiff's only common law claim of negligence was not

an adequate remedy at state law because it was entirely precluded by the defendant's sovereign immunity defense. Therefore, since the *Craig* plaintiff had no other viable common law claim, he was allowed to proceed with his state constitutional claim. 363 N.C. 334, 342, 678 S.E.2d 351, 356-57 (2009). The present case is clearly distinguishable from *Craig,* in that the Officers have more than "the possibility of relief" with their wrongful termination claim as well as claims for intentional infliction of emotional distress and defamation. The Officers have had "the opportunity to enter the courthouse doors and present" claims, unlike *Craig* where the plaintiff did not have an opportunity to conduct discovery or to otherwise "enter the courthouse doors."  The Officers in the present case were awarded front pay and one officer was reinstated, as further explained in Argument IV, *infra.*

"[A]dequacy is found not in success, but in chance." *Debaun v. Kuszaj,* 238 N.C. App. 36, 41, 767 S.E.2d 353 , 357 (2014) (finding that plaintiff's failure to overcome public official immunity did not render claim inadequate to provide for constitutional liability). *Corum* never guaranteed a recovery; rather, "it guarantees an opportunity to seek redress for the constitutional wrong." *Edwards v. City of Concord,* 827 F. Supp. 2d 517, 523 (M.D.N.C. 2011) (citing *Craig*, 363 N.C. at 340, 678 S.E.2d at 355-56).

In this case, the Officers not only pleaded and ultimately prevailed on a wrongful termination claim, but there are numerous other state claims that the

Officers could have raised. For example, the Officers put on extensive evidence, through their own testimony, testimony of family members, and finally the testimony of an expert psychologist, that they suffered from severe emotional distress because of their terminations. The Officers could have pursued claims for intentional or negligent infliction of emotional distress.

Further, the Officers put on evidence through their own testimony that the allegations of misconduct set forth in their termination letters were not true and kept them from obtaining jobs with other law enforcement agencies, and that one or more of Defendants kept them from getting jobs in other law enforcement agencies. The Officers may have been able to pursue defamation claims. Neither intentional infliction of emotional distress nor defamation are claims for which immunity applies.

The Officers' argument is unsupported by existing law and there is no reason to break new ground in this case. The district court's dismissal of the Officers' state constitution claim should be affirmed.

## IV.    THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN AWARDING FRONT PAY TO OFFICER MEDLIN BECAUSE REINSTATEMENT WAS INFEASIBLE.

Both reinstatement and front pay are reviewed for abuse of discretion. *See Dotson v. Pfizer*, 558 F.3d 284 (4th Cir. 2009). An abuse of discretion occurs only when a trial court has acted "arbitrarily or irrationally in admitting evidence, when

a court has failed to consider judicially recognized factors constraining its exercise of discretion, or when it has relied on erroneous factual or legal premises." *Del Zotto v. Universal Physical Services, LLC,* 214 F. Supp. 3d 499, 501 (D.S.C. 2016), citing *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005). Reversal is appropriate only if "the district court [was] clearly wrong or has committed an error of law." *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013).

Medlin can make no such showing. On the contrary, in exercising its discretion, the district court meticulously analyzed all the relevant factors both in denying reinstatement and determining the proper amount of front pay. Accordingly, its judgment should be affirmed.

As to reinstatement, the district court properly considered all the factors set forth in *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991). The court initially concluded that reinstatement was infeasible because: 1) no full-time position was available and the Town would have to terminate current employees to reinstate the Officers; 2) a working environment of mutual trust was infeasible since the Officers and several current MPD officers testified against each other at trial; and 3) Bralley was, at the time of the court's ruling, still employed as the town manager. [JA 2637]. On the Officers' motion for reconsideration, while the court found circumstances had changed sufficiently to permit Donathan's reinstatement, it found Medlin's relationship with the MPD had "only deteriorated" due in part to his ill-

advised social media postings. [JA 2637]. The court noted that, unlike Donathan, Medlin was no longer a certified law enforcement officer and therefore lacked a minimum qualification for the job. *Id.* The testimony of current MPD officers was also stronger against Medlin than Donathan, including evidence that Medlin was insubordinate, used MPD property for personal use, and colluded with Hunter to intimidate fellow MPD employees. *Id.*

As shown, the district court applied the correct legal standard in a thorough analysis of the facts. It carefully distinguished between Donathan and Medlin, concluding it was feasible to reinstate only one of the two. The court's ruling cannot reasonably be described as arbitrary, irrational, erroneous, or incomplete. It should be affirmed.

Similarly, the district court rigorously applied the correct standard in determining the amount of Medlin's front pay, as set forth in *Ogden v. Wax Works, Inc.,* 29 F. Supp. 2d 1003 (N.D. Iowa 1998). This detailed analysis included consideration of:

- Medlin's age;

- The length of time he was employed by the MPD;

- The likelihood his employment would have continued absent the unlawful discharge;

- The length of time it will take Medlin, using reasonable effort, to secure comparable employment;

- Medlin's work life expectancy;

- The length of time other employees typically held the position lost;

- Medlin's status as an at-will employee;

- His ability to work;

- His subjective intention to remain in the position; and

- Medlin's efforts to mitigate damages.

[JA 2637].

## CONCLUSION

Judge Schroeder properly applied the plain policy language and the closest applicable law to correctly decide that IRFFNC provides a $1,000,000 Limit for the Officers' combined claims. The policy clearly states that IRFFNC "will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance." (JA 2709) The District Court's ruling concerning IRFFNC's $1,000,000 coverage limit should be affirmed on appeal.

For the reasons stated above, the district court's judgment should be affirmed.

Respectfully submitted, this the 11th day of October, 2017.

CRANFILL SUMNER & HARTZOG LLP

BY:   /s/ Patrick H. Flanagan____
      PATRICK H. FLANAGAN
      NC State Bar No. 17407
      Post Office Box 30787
      Charlotte, NC 28230
      Telephone:  (704) 332-8300
      E-Mail: phf@cshlaw.com

VAN HOY, REUTLINGER, ADAMS & DUNN

BY:   PHILIP M. VAN HOY
      NC State Bar No. 5869
      STEPHEN J. DUNN
      NC State Bar No. 25796
      737 East Boulevard
      Charlotte, NC 28203
      Telephone:  (704) 375-6022
      Email:  phil.vanhoy@vradlaw.com
              steve.dunn@vradlaw.com

BROUGH LAW FIRM, PLLC

BY:   ALBERT M. BENSHOFF
      1526 East Franklin Street
      Suite 200
      Chapel Hill, NC 28025
      Telephone:  (980) 622-6440
      Email:  benshoff@broughlawfirm.com

*Counsel for Defendant-Appellee Town of Mocksville*

LITTLE & LITTLE, PLLC

BY:   CATHRYN M. LITTLE
      N.C. Bar No. 16974
      P. O. Box 20789
      Raleigh, NC  27619-0789
      Telephone:  (919) 856-0006
      E-mail:  cathrynmlittle@aol.com

*Counsel for Intervenor-Appellee Interlocal Risk
Financing Fund of North Carolina*

44

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this document contains <u>10,483</u> words.

2.    This document complies with the typeface requirements because:

    this document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated:  October 11, 2017          /s/ Patrick H. Flanagan
                                  Patrick H. Flanagan

                                  *Counsel for Appellee*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on October 11, 2017, I electronically filed the foregoing Corrected Appellees' Brief with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all the registered CM/ECF users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Priscilla C. Winkler
Priscilla C. Winkler
GibsonMoore Appellate Services, LLC
206 East Cary Street
Post Office Box 1460 (23218)
Richmond, VA  23219
(804) 249-7770 –  Telephone
(804) 249-7771 –  Facsimile
priscilla@gibsonmoore.net